UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X
JAMES PARK, CATHERINE RAMOS,
GEOFFREY ADAMSON and
MICHAEL KUZMIAK,

                                 *Plaintiffs,*

        -against-

SHINHAN FINANCIAL GROUP CO., LTD.,
SHINHAN BANK Co., Ltd,
SHINHAN BANK AMERICA,
JIN OK-DONG, JI YOUNG YOOK,
CHARLES CONSTANTIN, JUNG JI HO,
KANG SHIN TAE, DANIEL E. FRYE,
DAE-KI MIN, WALTER O'MEARA,
RYAN PAK and LEE SOON YOO,

                             *Defendants.*
--------------------------------------------------------X

Civil Action No.: 22-CV-10331 (VSB)(KHP)

**<u>AMENDED COMPLAINT</u>**

**JURY TRIAL DEMANDED**

**<u>PRELIMINARY STATEMENT</u>**

1.    Plaintiffs bring this action against Defendants, including SHINHAN BANK AMERICA ("SHBA"), for unlawful retaliatory discharge in violation of the Financial Institutions Reform, Recovery and Enforcement Act of 1989 ("FIRREA"), 12 U.S.C. § 1831j, *et seq.*

2.    Plaintiffs bring this action against Defendants, including SHINHAN FINANCIAL GROUP CO., LTD. and SHINHAN BANK Co., Ltd., for unlawful whistleblower discrimination in violation of the Bank Secrecy Act, as amended by the Anti-Money Laundering Act of 2020 ("AMLA"), 31 U.S.C. § 5323, *et seq.*

3.    Plaintiff CATHERINE RAMOS ("RAMOS") also brings this action for sex discrimination, harassment, and hostile work environment pursuant to New York City Human Rights Law, §8-107 *et seq.* of the Administrative Code ("CHRL").

4.      Plaintiff JAMES PARK ("PARK") brings this action for hostile work environment pursuant to the CHRL.

5.      Plaintiffs RAMOS and PARK both bring this action for unlawful retaliation pursuant to the CHRL as Defendants unlawfully terminated their employment after RAMOS and PARK protested and opposed the unlawful sexual harassment and gender-based discrimination against RAMOS.

## JURISDICTION AND VENUE

6.      This Court has original jurisdiction over the subject matter of this litigation pursuant to 28 U.S.C §1331, in that certain of the Plaintiffs' claims arise under the laws of the United States, namely under the AMLA of 2020, 31 U.S.C. § 5323, *et seq.,* and Title 12 U.S.C. § 1831j(b) of the Depository Institution Employee Protection Remedy.

7.      This court has supplemental jurisdiction over the CHRL claims asserted.

8.      Venue is proper under 42 U.S.C §2000e-5(f)(3) and 28 U.S.C §1391(b) because the events or omissions giving rise to the claims occurred in the Southern District of New York, and one or more of the Defendants resides and/or conducts business transactions in this District.

## THE PARTIES

9.      At all relevant times, PARK was employed by Defendant SHBA as its Senior Vice President and Bank Secrecy Act Officer ("BSAO") from September 3, 2019 until Defendants unlawfully terminated his employment on February 26, 2021.

10.     At all relevant times, RAMOS worked for SHBA as a First Vice President Deputy BSA Officer from September 9, 2019 until her unlawful dismissal on February 26, 2021. Throughout her tenure, RAMOS reported to PARK.

11.    Plaintiff Geoffrey Adamson ("ADAMSON") worked for SHBA as a First Vice President Anti-Money Laundering ("AML") Systems and Advisory from November 12, 2019 until his unlawful dismissal on October 9, 2020. ADAMSON reported to PARK and RAMOS.

12.    Plaintiff Michael Kuzmiak ("KUZMIAK") worked for SHBA as its Vice President AML Systems and Advisory from January 15, 2020, until his unlawful dismissal on March 4, 2021. KUZMIAK reported to ADAMSON until October 9, 2020 and thereafter to Defendant CHARLES CONSTANTIN.

13.    Defendant SHINHAN FINANCIAL GROUP CO., LTD. is a financial holding company headquartered in Seoul, South Korea, which owns subsidiaries in South Korea and around the world providing a full range of financial services, including banking, securities, life insurance, and investment banking.

14.    Defendant SHINHAN BANK CO., LTD., is a wholly owned subsidiary of SHINHAN FINANCIAL GROUP CO., LTD. with headquarters at 20, Sejong-daero 9-gil, Jung-gu, Seoul, South Korea.

15.    Defendant SHBA was incorporated within the USA with headquarters at 475 Park Avenue, South FL4, New York, New York 10016, and has branches throughout the USA. SHBA is a wholly owned subsidiary of SHINHAN FINANCIAL GROUP CO., LTD.

16.    SHINHAN FINANCIAL GROUP CO., LTD., SHINHAN BANK Co., Ltd., and SHBA (collectively "SHINHAN BANK") are all commonly managed and operated entities and controlled directly from South Korea.

17.    SHINHAN FINANCIAL GROUP CO., LTD. is the parent entity that owns, directly manages and controls all of its subsidiaries, including SHINHAN BANK Co., Ltd. and SHBA.

18.     SHINHAN FINANCIAL GROUP CO., LTD. and SHINHAN BANK Co., Ltd. (hereinafter collectively referred to as "the Korean Parent Banks") completely controlled the day-to-day operations and management of SHBA to perpetrate the unlawful acts complained of herein; and/or completely controlled and managed SHBA's banking, financial and bank secrecy reporting activities and personnel decisions so as to completely dominate SHBA.

19.     Therefore, at all relevant times, SHBA was the effective alter ego and agent of the Korean Parent Banks.

20.      The Korean Parent Banks purposefully availed themselves of the benefit of doing business in this forum, and SHBA acted with the knowledge of, consent and extensive control by the Korean entities and officers.

21.     Defendant JIN OK-DONG is the CEO of SHINHAN BANK Co., Ltd., and personally controlled and managed SHBA's operations and was personally responsible for many of the unlawful actions complained of herein.

22.     Defendant JI YOUNG YOOK is the CEO of SHBA and was personally responsible for many of the unlawful actions complained of herein.

23.     Defendant CHARLES CONSTANTIN was, at all relevant times, SHBA'S Executive Vice President and Chief BSA Officer and was personally responsible for sexually harassing RAMOS and for the other unlawful conduct leveled against him.

24.     Defendant JUNG JI HO was, at all relevant times, Head of SHINHAN BANK Co., Ltd.'s Corporate Foreign Currency Group and was personally responsible for many of the unlawful actions complained of herein.

25.     Defendant KANG SHIN TAE is the current Head of SHINHAN BANK Co., Ltd.'s Global Department and oversaw SHINHAN FINANCIAL GROUP CO., LTD.'s foreign

subsidiaries outside of South Korea; and he was directly involved in the unlawful actions complained of.

26.     Defendant DANIEL E. FRYE was at all relevant times the Chairman of SHBA's Compliance Committee of the Board ("CCOB"), and he was personally involved in many of the unlawful actions complained of.

27.     Defendants DAE-KI MIN was at all relevant times the Chairman of SHBA's Board of Directors, was a member of the CCOB, and he was personally involved in many of the unlawful actions complained of.

28.     Defendant WALTER O'MEARA was at relevant times the Director of SHBA's Board of Directors, was a member of the CCOB, and he was personally involved in many of the unlawful actions complained of.

29.     Defendant RYAN PAK was at all relevant times the Director and a member of SHBA's Board of Directors, was a member of the CCOB, and he was personally involved in many of the unlawful actions complained of.

30.     Defendant LEE SOON YOO was at all relevant times the Head of SHINHAN BANK Co., Ltd.'s Compliance Department, was a member of the CCOB, and he was personally involved in many of the unlawful actions complained of

**THE FACTS**

31.     Plaintiffs RAMOS and PARK are seasoned Compliance Officers with over seventeen years of experience in the field of financial and banking compliance and anti-money laundering.

32.     ADAMSON and KUZMIAK also have extensive years of experience working in financial institutions and brought relevant compliance and technical experience to SHBA's BSA Department.

33.     Throughout their employment, Plaintiffs worked diligently to address and resolve serious issues identified during the New York State and Federal Bank Secrecy Act/Anti-Money Laundering Examinations.

34.     Plaintiffs were responsible for ensuring that SHBA complied with the many regulations governing its transactions, including the Bank Secrecy Act (BSA) and its corresponding federal regulations, which require financial institutions such as SHBA "to guard against money laundering through financial institutions" and to "establish anti-money laundering programs," which include "the designation of a compliance officer." *See* 31 U.S.C. §5318(h).

35.     As BSA Compliance Officers, Plaintiffs were responsible for the supervision and administration of SHBA's compliance with anti-money laundering laws, including the BSA.

36.     Among other things, the BSA requires financial institutions to report suspicious activities that might signify criminal conduct. *See* 31 U.S.C. §§ 5311-5330.

37.     The CCOB's function was to oversee BSA personnel decisions at SHBA and document them to ensure compliance with the law.

38.     The CCOB was ostensibly also responsible for overseeing SHBA's BSA and AML activities, by meeting periodically, reviewing decisions and documenting their decisions in meeting minutes.

39.     Defendants FRYE, DAE-KI MIN, O'MEARA and PAK were all members of the CCOB, and therefore they oversaw Defendants' BSA and anti-money laundering compliance.

40.     An effective BSA Department has five pillars, which is 1) having a qualified BSA Officer with the requisite knowledge and experience; 2) strong internal controls through internal policies and procedures; 3) training; 4) independent testing; and 5) customer due diligence to identify beneficial owners.

6

41.    Effective and independent oversight of the foregoing aspects by the CCOB was key to ensuring regulatory and enforcement compliance and an intimate knowledge of the BSA laws was essential for the members of the CCOB.

42.    Several members of the CCOB, including Defendants FRYE and O'MEARA, are retired FDIC examiners.

43.    Defendants MIN, PAK, FRYE and O'MEARA have been members of SHBA's CCOB for many years.

44.    As stated below, however, the CCOB were delinquent in their oversight of SHBA's BSA efforts and merely "rubberstamped" decisions by the Korean Parent Banks and the individual Defendants.

45.    For many years, the CCOB has utterly failed to ensure compliance by SHBA with the BSA and the Consent Orders imposed by the Federal and State banking regulators against SHBA.

46.    As outlined below, CCOB did not scrutinize Defendants' unlawful dismissal of the Plaintiffs for their whistleblowing activities.

47.    A former senior FDIC examiner, Kristi Keatinge, was also a member of the CCOB from late September 2020 until January 2021, before she resigned abruptly.

48.    In Ms. Keatinge's resignation letter, she noted she had attempted to take an active part in the CCOB and had offered many ideas for remediating the BSA department and she still hoped that the CCOB and Board would consider her proposals.

49.    Federal regulations clarify that banks are required to submit a suspicious activity report ("SAR") to the Treasury's Financial Crimes Enforcement Network ("FinCEN") if the bank

detects insider abuse involving any amount within 30 days of discovering the conduct. *See* 12 C.F.R. § 353.3.

50.     Plaintiffs were also personally responsible for ensuring that SHBA complied with banking regulations and were personally subject to various criminal and civil penalties if they failed in their obligations, including fines of up to $25,000 per day for each violation (*see* 31 U.S.C. §5321(a), an injunction being issued against them (*see* 31 U.S.C. §5320) and criminal penalties (*see* 31 U.S.C. §5322).

51.     SHBA's deficient BSA compliance practices have been the subject of scrutiny and investigation for many years by Federal and New York State regulators.

52.     Of particular concern has, and continues to be, SHBA's BSA/AML Compliance Program, which was the subject of a FDIC investigation culminating in a 2017 Consent Order ("the Consent Order").

53.     The Consent Order highlighted the serious failures uncovered by the investigation and it emphasized, among other things, that having qualified staff was essential to the success of any remediating effort.

54.     The Consent Order required SHBA to "increase its supervision and direction in the affairs of SHBA's BSA/AML Compliance Program, assuming full responsibility for the approval of sound BSA/AML policies, procedures and processes, consistent with the role and expertise commonly expected for directors of banks of comparable size and risk."

55.     The Consent Order also required SHBA to "have and retain management qualified to oversee all aspects of SHBA's BSA/AML Compliance Program. Management shall ensure compliance with all applicable laws and regulations that govern BSA/AML compliance. Each

member of management shall have the qualifications and experience commensurate with his or her duties and responsibilities related to applicable BSA/AML laws and regulations."

56.     As stated below, the Defendants ignored the letter and spirit of the Consent Order.

## SHBA's BSA Department was Severely Understaffed

57.     In 2019, there were a total of five different BSA officers running SHBA's BSA and AML Department, and there was a very high turnover of managers and staff.

58.     For example, in or about the end of August 2019, PARK's predecessor as SHBA's Senior Vice President and Bank Secrecy Act Officer, Kevin Choi, resigned after only three months at SHBA.

59.     Upon his resignation, or shortly prior, Mr. Choi wrote an internal memo, titled "BSA Program Issues," in which he criticized SHBA's management and their oversight of the BSA program.

60.     Mr. Choi described in this memo that SHBA's BSA/AML "issues are much more significant and more numerous than I have been led to believe both with work and employees" and that he had never worked in such an "unhappy stressful and dysfunctional environment."

61.     Mr. Choi referred to his immediate predecessor at SHBA, Tracy-Ann George, as having been a "whistleblower."

62.     Mr. Choi wrote that his staff had "limited experience and knowledge" and that he had not received "the support [he] was supposed to receive" and he referred to Defendants' "unwillingness to pay employees market value" and to "bring current employees to respectable level."

63.     Mr. Choi's written memorandum complaint and/or resignation letter was saved on SHBA's Shared Drive and viewable by all staff with access.

64.     Prior to Mr. Choi's hiring, Defendants had installed two Korean expats, Paul Park and Sang Wook Lee, to work in SHBA's BSA/AML Department as managers.

65.     While these two employees nominally reported to Kevin Choi, in fact they reported directly to the Korean Parent Banks.

66.     Mssrs. Park and Lee, along with two additional Korean expat employees, Hee Sung Yoon and Sang Yu Yang, were installed to ensure direct oversight and control of SHBA's BSA/AML Department by SHINHAN BANK Co., Ltd. and by Defendant JIN OK-DONG.

67.     These expat employees would have been aware of Mr. Choi's memo and would have been alerted about the allegations regarding Ms. George's whistleblower activity and about the BSA/AML deficiencies that persisted beyond her tenure.

68.     Upon information and belief, Paul Park, Mr. Lee, Mr. Yoon and/or Mr. Yang would have sent Mr. Choi's memo to JIN OK-DONG and other Upper-Level managers at SHINHAN BANK Co., Ltd.

**Plaintiffs PARK and RAMOS are Hired by SHBA**

69.     Shortly after Mr. Choi's resignation, PARK was hired as his replacement in September 2019.

70.     RAMOS was also hired shortly after PARK's appointment.

71.     PARK and RAMOS were hired, ostensibly, to lead SHBA's BSA efforts and to remedy the deficiencies highlighted by the FDIC and the NY DFS and to abide by the terms of the Consent Order.

72.     ADAMSON and KUZMIAK were also hired soon thereafter to aid in those compliance efforts.

73.     Throughout PARK, RAMOS, ADAMSON and KUZMIAK's tenure, Defendants seriously impeded their and other BSA managers' ability to correct their BSA program.

74.     The measures and decisions to impede Plaintiffs' ability to correct BSA's program and ensure compliance with the Consent Order was orchestrated and directly overseen by the Korean Parent Banks and Defendant JIN OK-DONG.

75.     Defendants obstructing Plaintiffs' compliance efforts by limiting Plaintiffs' independence and resources and by actively ignoring the remedial actions recommended by PARK and his BSA Team.

76.     For example, Defendants sought to conceal the extent of gaps in the detection of large cash transactions by restricting Plaintiffs' ability to make this critical determination.

77.     The FDIC had identified inadequate transaction monitoring in the Consent Order as an "Internal Control" failure.

78.     The Consent Order required "[w]ithin 90 days from the effective date of this ORDER" that Defendants:

> "review, revise and implement a system of internal controls designed to ensure full compliance with the BSA ("BSA Internal Controls") taking into consideration its size and risk profile" and "revise and enhance its policies, procedures, processes, and systems for monitoring, detecting, and reporting suspicious activity being conducted in all areas within or through the Bank; and ensure the timely, accurate, and complete filing of Suspicious Activity Reports ("SARs"), with an appropriate level of documentation and support for management's decisions to file or not to file a SAR, as required by law. These policies, procedures, processes, and systems should ensure that all relevant areas of the Bank are monitored for suspicious activity, including, but not limited to: deposit/cash

transactions, ACH and ATM transactions, intermediary wire transfers, and money service businesses. Any systems the Bank plans to utilize to assist in monitoring, detecting and reporting suspicious activity should be validated, and parameters which are established should be supported through a documented analysis of appropriate information."

79.     In fact, Defendants violated this and other mandates contained in the Consent Order.

80.     Key in Defendants' efforts to conceal, obstruct and prevent effective compliance with US BSA/AML laws and regulations were the Korean expat employees who surveilled and scrutinized Plaintiffs and the other BSA staff and reported their activities to the Korean Parent Banks.

**Defendants Obstructed Transaction Monitoring and Remediation**

81.     Integral to the SHBA's BSA and AML compliance was an effective real time monitoring system to review and screen transactions to detect suspect large cash transactions.

82.     The SHBA's system in place to perform this function, the "BAM+" system, was cited by regulators as defective as it had failed to detect "thousands of large cash transactions."

83.     The "BAM+" system's detection failures required a custom data extract by a third-party vendor, "Abrigo," the company who had developed and owned the "BAM+" system.

84.     For several months, PARK and ADAMSON had urged SHBA's senior management, including its then CEO, Tae Won Suh, to approve this data extract throughout Spring and Summer of 2020.

85.     Mr. Suh refused to approve this data extract for an extended period but ultimately relented.

86.     Prior to PARK's hire, SHBA had adopted a new transaction monitoring system, Oracle's "Financial Crime and Compliance Management" ("FCCM") suite.

87.     SHBA approved the transition to Oracle FCCM after the Consent Order had found SHBA's internal controls and the transaction monitoring to be defective.

88.     One of the most important projects facing PARK and his team was the transition from "BAM+" to "Oracle FCCM."

89.     Before transitioning from "BAM+" to "Oracle FCCM," PARK and his staff were required to ensure continuity of coverage by "parallel testing" both systems to determine if there were any gaps in coverage. This testing was an involved and time-consuming process.

90.     On July 1, 2020, Mr. Suh forced PARK to "go live" with the "Oracle FCCM" system even though the parallel testing had still not been completed.

91.     PARK asked Mr. Suh to delay the implementation of the "Oracle FCCM" system after the parallel testing had been completed so that they could determine any coverage gaps and close those gaps.

92.     In response, Mr. Suh pounded his desk and ordered PARK to implement the "Oracle FCCM" system by July 1, 2020, as SHBA had already "spent millions of dollars" on it.

As stated below, Mr. Suh further obstructed the implementation of an effective transaction monitoring system by terminating the employment of ADAMSON who had been analyzing the data and proposing a review of thousands of missing large cash alerts.

**PARK'S Responses to the Report of Examination of July 2020**

93.     PARK was required to draft responses to the Examiner's Report of Examination ("ROE") in 2020.

94.     PARK's responses to the ROE, dated August 2020, included the requirement for SHBA to obtain data extraction on past cash alerts missed by "BAM+" and to screen for missed transactions.

95.     This data extraction formed part of PARK's Comprehensive Action Plan submitted to the regulators at this time.

96.     Ultimately, PARK's Comprehensive Action Plan was approved by the Board and in September 2020, Mr. Suh reluctantly agreed to sign the contract with Abrigo for the data extract to determine the cash alerts missed by "BAM+."

97.     PARK had requested approval for this expenditure for months but had been denied.

98.     ADAMSON had developed the methodology to review the missing cash transactions data and started to analyze the data in late September and early October 2020 to determine the gaps.

99.     ADAMSON and KUZMIAK analyzed the data and identified the customers with missing cash alerts and were alarmed to find many large cash transactions had moved through SHBA completely undetected.

100.    Plaintiffs discovered that every month millions of dollars were being deposited and withdrawn in large cash transactions that went undetected by SHBA's transaction monitoring system.

101.    ADAMSON and KUZMIAK also identified thousands of customers as requiring review.

102.    ADAMSON had already requested proposals from two outside consulting firms to conduct a "look-back" review to detect previously undetected transactions.

103.    ADAMSON sent a non-disclosure agreement to Brian Park, SHBA's legal counsel for his approval for one firm to conduct such a "look-back" review.

104.    Brian Park wrote back to ADAMSON on September 16, 2020 stating, "Legal Department was asked by the Parent Bank team to hold off" on all projects.

105.    SHBA's failure to adequately monitor cash transactions had been endemic within SHBA for many years. For example, in 2017 and 2018, SHBA was required by the Consent Order to

complete a "Look-back Review" with an external consulting company costing millions of dollars.

106.     As stated below, Defendants prevented PARK from initiating a review of customers who had large cash transactions that went undetected by the "BAM+" system and it terminated his employment before he and his staff could complete the review of customers who had large cash transactions.

107.     Meanwhile, the problems brought out by the forced premature migration to "Oracle FCCM" on July 1, 2020 were compounded by the fact that SHBA's IT department lacked the experience, skills and training to oversee and maintain the new monitoring system.

108.     So, PARK and ADAMSON urged SHBA to enter into maintenance contacts with Oracle to outsource to Oracle the oversight and implementation of "Oracle FCCM."

109.     Mr. Suh claimed, however, that the Oracle maintenance contracts proposed by PARK and ADAMSON were too expensive and that its internal IT staff could manage the system.

110.     In truth, SHBA's IT Department lacked the expertise to handle SHBA's FCCM system.

111.     SHBA's IT Department had completely ill-equipped to manage the simpler BAM+ system, which was why that responsibility had been outsourced to a vendor.

112.     Having Oracle manage FCCM's IT requirements was long recommended by PARK and his team and was, among other things, outlined in PARK's Comprehensive Action Plan in response to the ROE.

113.     Meanwhile, PARK and ADAMSON's concerns about going prematurely live with the Oracle FCCM system before the parallel testing was completed was borne out.

114.    A vendor performed parallel testing in October and November 2020 found the new Oracle FCCM system to have an alarmingly large detection gap when compared with the coverage provided by BAM+.

115.    These detection gaps should have been detected and closed before "going live" with FCCM on July 1, 2020, and these transaction monitoring gaps were caused by the premature migration.

116.    PARK made various urgent recommendations to Mr. Suh on how to remediate and close the detection gap.

117.    Mr. Suh and SHBA refused to implement any of PARK's recommendations to resolve the detection gap.

### The Korean Parent Banks Increase Their Surveillance and Control to Further Impede Plaintiffs

118.    In 2020, and given SHBA's failure to remedy the deficiencies, the Consent Order was continued or extended.

119.    In response to the continuation of the Consent Order, Defendant JIN OK-DONG and others at SHINHAN BANK Co., Ltd. sent a "Task Force" of several upper-level managers of SHINHAN BANK Co., Ltd., headed by Defendant JI YOUNG YOOK,[1] to oversee SHBA's response to the ROE (hereinafter "the Task Force.")

120.    Josh Yoon, another Korean expat, had worked in SHBA's IT Department but was transferred to SHBA's BSA Department prior to November 2019 and he became the Task Force liaison.

---

[1] JI YOUNG YOOK[1] was subsequently appointed to a Director position and CCOB member in or about September, 2020 before becoming SHBA's CEO in December 2020.

121.     This Task Force was intimately involved in all areas of the BSA/AML program and they reported throughout directly to the Korean Parent Banks, entirely bypassing oversight or management by SHBA or PARK.

### PARK Drafts Remediation Proposals in a Response to the Regulator's Report of Examination ("ROE").

122.     Meanwhile, PARK drafted SHBA's response to the ROE in the form of a "Comprehensive Action Plan" ("CAP") and a subsequent "Comprehensive Project Plan" ("CPP"), in which he laid out various commitments with costs and beginning and end dates mapped back to the ROE Responses by SHBA to remediate the issues identified by the examiners in the ROE.

123.     ADAMSON had been key in identifying and measuring critical gaps in the effectiveness of SHBA's BSA/AML monitoring systems and ADAMSON was a key contributor to both the CAP and CPP.

124.     Many of these measures that PARK included in the CAP and CPP were the very same measures that PARK and his BSA Department had been urging Defendants to adopt and implement from the inception of PARK and RAMOS's employment in 2019 but that Defendants had obstructed and/or delayed.

125.     During the period August through early September, 2020, PARK submitted his draft response to the ROE to SHBA's CCOB, to SHBA's senior managers, to the Task Force members and the upper-level managers of SHINHAN BANK Co., Ltd.

126.     Subsequently, and contrary to PARK'S explicit directions and recommendations, the Task Force forced PARK to alter and dilute the measures laid out in PARK's initial Draft Response to ROE, which was uploaded and sent to FDIC and the NY DFS.

127.     Mr. Suh told PARK that Defendant JIN OK-DONG was personally managing SHBA's remediation efforts by directing the Task Force.

128.     The CCOB were also ineffective and refused to approve PARK's recommendations.

129.     The CCOB only cursorily reviewed the CAP and ROE Responses drafted by PARK, and ADAMSON, but refused to implement PARK's proposals.

130.     Instead, the CCOB rubberstamped the JI YOUNG YOOK and Korean Parent Banks' decision to place all remediation projects on hold.

131.     PARK's CAP was then completely removed from the CCOB's agenda for subsequent CCOB meetings in 2020.

132.     Meanwhile, during the summer of 2020, surveillance of BSA staff – including for possible whistleblowing activity - by Defendants' Korean expat employees intensified and they were joined in this monitoring by members of the newly arrived Task Force from Korea.

133.     One method of surveillance Defendants employed was to surreptitiously join BSA staff meetings held by teleconference, including meetings to which they had not been invited.

134.     After the COVID pandemic began in March 2020, PARK changed his weekly in-person BSA managers meeting to a daily remote teleconference with his BSA managers.

135.     PARK and those managers invited to attend these teleconferences invariably noticed additional anonymous persons in attendance who had not been invited to attend and only noticed them as their telephone numbers would show up on the screen on the list of attendees.

**PARK's Authority Diminished After CONSTANTIN is Hired**.

136.     Meanwhile, Defendants JIN OK-DONG and SHINHAN BANK Co., Ltd. effectively obstructed all attempts by Plaintiffs at remediation by appointing on September 21, 2020, CONSTANTIN as SHBA's Executive Vice President and Chief BSA Officer.

137.   Mr. Suh told PARK he had opposed the hiring of CONSTANTIN but he was overridden Defendant JIN OK-DONG who personally appointed CONSTANTIN.

138.   Prior to this appointment, CONSTANTIN had worked for almost two years at Shinhan Bank Agency as its Chief Compliance Officer and Deputy General Manager.

139.   PARK reported directly to CONSTANTIN.

140.   The CCOB approved the decision to appoint CONSTANTIN without scrutinizing the decision and without creating minutes explaining the appointment and how it would affect the BSA Department.

141.   It became immediately apparent that CONSTANTIN's appointment was aimed at further controlling and limiting PARK's independence and increasing the control and management of SHBA's BSA Department by the Korea Parent Banks.

142.   After CONSTANTIN's appointment, PARK was excluded from all meetings of the CCOB and therefore the CCOB lacked insight from PARK, the key manager who oversaw and implemented the BSA program.

143.   PARK's authority was removed and he became in effect merely the "Head of Transaction Monitoring," while retaining the title of BSA Officer in name only.

144.   On or about November 17, 2020, PARK and CONSTANTIN discussed the BSA audit findings.

145.   PARK provided detailed evidence that all 21 findings had been corrected or remediated prior to the most recent audit.

146.   CONSTANTIN then had three final audit vetting meetings with the auditors.

147.   CONSTANTIN did not invite auditee PARK to these meetings nor did CONSTANTIN bring PARK's evidence on the remediation of all 21 findings to these meetings.

148.    As a result, the internal audit department gave the BSA Department an "Unsatisfactory" rating in November 2020.

149.    PARK had evidence that the audit findings were not valid findings, and provided that evidence to auditors, but CONSTANTIN disregarded this, concealed the evidence, and informed the auditors that he accepted their findings.

150.    Subsequently, and because of Defendants' obstructions and violations of the BSA/AML, Plaintiffs were forced to send the FDIC and the NY DFS examiners complaints via email and via the "FDIC Connect" online portal of these violations.

151.    Plaintiffs also alerted the examiners as to Defendants' willful refusal to abide by the spirit and letter of the 2017 Consent Order and the ROEs issued since.

152.    In retaliation for this whistleblower activity, within a relatively short period, CONSTANTIN, acting under the direction of the Korean Parent Banks and the Executives in Korea, and in particular, Defendant JIN OK-DONG, fired PARK, RAMOS, ADAMSON, and KUZMIAK unlawfully.

153.    Defendants fired Plaintiffs in retaliation for their whistleblower activity to the FDIC and the NYS DFS.

**ADAMSON's Whistleblower Activity**

154.    Commencing January 2020, ADAMSON alerted senior management of Defendants' continuing BSA violations and their efforts to curtail Plaintiff's BSA and AML efforts and about other health and safety violations.

155.     For example, in January and February, 2020, ADAMSON complained about fire safety issues (i.e., locked doors to stairwells) in SBHA's building to the managers of the multi-tenanted building management directly.

156.    When he learned of these complaints, Joohern Lee, SHBA'S COO, confronted ADAMSON and directed him not to complain again.

157.    ADAMSON refused to agree, however, not to alert management about health and safety issues.

158.    On March 13, 2020, ADAMSON emailed Brian Park, SHBA's General Counsel, informing him he had violated his legal and moral duty by not disclosing to SHBA's employees that his assistant counsel had been in close contact with someone infected with the COVID-19 virus.

159.    On March 19, 2020, ADAMSON sent an email entitled "FDIC Requirements in a Pandemic" to the Plaintiffs, and Brian Newman, SHBA's Transaction Manager, pointing out violations and that these were FDIC-mandated requirements binding on SHBA.

160.    On March 20, 2020, ADAMSON sent PARK and RAMOS, and Paul Park (the Senior Expat Korean employee in the BSA Department of SHINHAN BANK Co., Ltd.) a draft email listing the FDIC pandemic rule violations at SHBA.

161.    Plaintiff PARK forwarded ADAMSON's draft email to SHBA's CEO and to its Chief Strategy Officer, Cho Jung Hoon.

162.    Thereafter, Defendants and, in particular, the three Korean expats, Paul Park, Josh Yoon and Sang Wook Lee intensified their surveillance of ADAMSON and the other Plaintiffs and BSA staff.

163.    Paul Park, Josh Yoon and Sang Wook Lee, whose cubicles were near Plaintiffs, demanded lengthy briefings with Plaintiffs and the other BSA staff on their activities, which they reported directly to Korea.

164.    PARK, who is a native Korean speaker, directly overheard Paul Park, Josh Yoon and Sang Wook Lee's daily reports to managers at SHINHAN BANK Co., Ltd.

165.    Meanwhile, by email, dated September 3, 2020, ADAMSON emailed six managers, including Paul Park, recommending that Jim Richards be appointed to SHBA's Board and the CCOB.

166.    Mr. Richards had communicated an interest for the position to ADAMSON.

167.    Mr. Richards was a preeminent BSA expert and had served as a BSA Officer at Wells Fargo for thirteen years.

168.    Paul Park refused to arrange an interview of Mr. Richards by Mr. Suh or Mr. Cho.

169.    Instead, Mr. Richards was interviewed by Plaintiff PARK, Paul Park and ADAMSON.

170.    PARK and ADAMSON told Paul Park that Mr. Richards would be a useful and important addition to the CCOB to address the ongoing compliance issues.

171.    However, Paul Park refused to recommend Mr. Richards' appointment to Mr. Suh and Mr. Richards was not appointed to any position.

172.    After months of complaining to Defendants regarding their violations of the BSA, and in the face of Defendants' intensifying obstruction and ongoing failure to abide by the BSA, ADAMSON was forced to notify the FDIC of Defendants' violations of the BSA.

173.    On September 14, 2020, ADAMSON registered with "FDIC Connect," a secure Internet portal for FDIC-insured institutions to conduct business and exchange information with FDIC.

174.    Defendants were aware of ADAMSON's registration with "FDIC Connect."

175.    ADAMSON's registration email was sent to his SHBA email account and thus would have been detected by Defendants' IT monitoring department.

176.   Further, by email, dated September 16, 2020, ADAMSON sent an email entitled "Matters Requiring Urgent Supervisory Attention at Shinhan Bank America" to Jill Cereghino and Noah Rosenthal, both enforcement agents at the FDIC who had performed the annual examination for the period September, 2018 through September, 2019.

177.   In that email, ADAMSON wrote, "I writing to bring to your attention some observations on Bank governance of BSA, management refusal by endless delay to providie [sic] the required resources and constraints on the independence and the lack of support of James Park and Catherine Ramos by senior management. The conditions under which the BSA department has operated have surprisingly worsened since the release of the ROE and proposed recent changes will significantly slow remediation activity and likely obstruct progress altogether."

178.   ADAMSON then cited numerous specifics before adding, "FDIC supervision is immediately required" including in the form of a "[m]onitor who could shadow us and report to you.  I am earnestly asking you to enforce the direction of the ROE on SHBA, disallow direct rule from Korea, make the CCOB more effective, and not allow constructive dismissal of James [PARK]."

179.   In this September 16, 2020 complaint ADAMSON also protested that the Korean "Task Force" and management from the Korea Parent Banks exercised direct control, citing the memo from Brian Park, General Counsel, advising that the "Korean Parent Bank" had instructed that all remediation projects be put on hold.

180.   ADAMSON forwarded this September 16, 2020 email to Plaintiffs PARK, RAMOS and KUZMIAK, and to Eva Errico and Brian Newman, both part of the BSA team.

181.   On September 21, 2020, ADAMSON logged in to FDIC Connect and uploaded a complaint letter describing control by the Task Force: "I am writing to let you that governance of

SHBA has changed and that direct control at least over BSA matters is now exercised directly by the Parent Bank through the agency of "task force" members sent by the head of international banking in Seoul."

182.    Meanwhile, on Friday October 2, 2020, after work hours, headquarters staff received an email requiring them all to work in the office from the following Monday, which ADAMSON identified as a violation of New York City's COVID-19 directives.

183.    ADAMSON informed his managers that if they would not comply with the regulations, he would write to the NYC Building Department to ask them to inspect the premises and enforce COVID-19 directives.

184.    In the face of SHBA's refusal to comply, ADAMSON was forced to notify the authorities on October 4, 2020.

185.    The NYC Building Department conducted an investigation and inspection on October 5, 2020 and found clear violations.

186.    Within a day of this finding, SHBA reversed its requirement that all staff work in the office and within three days it dismissed ADAMSON.

187.    By letter, dated October 9, 2020, Defendants terminated ADAMSON's employment, stating, "SHBA has decided to undergo BSA/ AML&OFAC divisional restructuring and part of this restructuring plan eliminates your current position within SHBA."

188.    The letter continued that, "[t]he Bank has determined that your expertise in the BAU [sic] Systems management is currently not essential to SHBA's continued business and that it is SHBA's best interest to from time hire outside consultants to perform this function."

189.    ADAMSON's work performance had been highly rated and Plaintiff PARK vehemently opposed ADAMSON's discharge.

190.    During the December 2020 meeting of the CCOB (which was attended by Defendants FRYE, DAE-KI MIN, O'MEARA and RYAN PAK), CONSTANTIN claimed he fired ADAMSON for not logging into SHBA's systems for three months, a ludicrous claim refuted by the records.

191.    Informed by SHBA's Human Resources on October 9, 2020, that they planned to terminate ADAMSON's employment later that day, PARK immediately met with Mr. Suh to prevent ADAMSON's dismissal.

192.    PARK strongly objected ADAMSON's dismissal to Mr. Suh and argued that it was completely unjustified given ADAMSON's exemplary work and that his departure was highly detrimental to his department in view of his key role.

193.    By way of example, PARK highlighted ADAMSON's intimate knowledge of the many defects and underlying details of the newly implemented Oracle FCCM platform.

194.    Also, as Mr. Suh was aware, at this time, ADAMSON had been leading the analysis of the missing cash transaction alerts and was reviewing SHBA's large and complex customer relationships and managing the Oracle FCCM conversion and closing its known problems.

195.    Mr. Suh ended this meeting by telling PARK he no longer had authority over the BSA Department as Defendant JIN OK DONG personally controlled "everything regarding BSA" at SHBA and that JIN OK DONG was "spearheading" SHBA's BSA department.

196.    Defendants refused to reinstate ADAMSON.

197.    On December 21, 2020, DFS enforcement attorneys interviewed ADAMSON for almost two hours regarding his emailed complaints, during which ADAMSON described at length Defendants' failures and violations.

198.   SHBA hired a consultant, Nyron Davidson, ostensibly to replace ADAMSON but Mr. Davidson did not perform any of ADAMSON's responsibilities.

199.   Rather, ADAMSON's responsibilities were assumed by Sang Yup Kim, who was formally an employee of SHBA, but in truth, reported directly to the Korean Parent Banks.

200.   Prior to assuming his new role, Mr. Kim had been assigned to work in SHBA's IT Department and lacked prior BSA knowledge and was therefore not qualified to perform ADAMSON's work.

201.   Mr. Kim is an expat from SHINHAN BANK Co., Ltd. and his prior work experience was limited to the technical operation of an in-house proprietary banking core system "Aither."

202.   ADAMSON's abrupt departure seriously impeded remediation activity that undoubtedly impacted SHBA's examination results and the ROE issued in 2021 and, upon information and belief, led to further citations for serious violations.

### KUZMIAK's Whistleblower Activity.

203.   By email, dated September 20, 2020, KUZMIAK sent an email to the FDIC examiners in which he cited Defendants' BSA violations at length, including the "deterioration" of Defendants' "senior management's resolve to provide the resources necessary for remediation."

204.   In his complaint, KUZMIAK also protested the deteriorating program including the lack of resources for the Oracle FCCM system, that PARK's authority had been curtailed and that PARK had been forced to begin using Oracle FCCM for transaction monitoring prematurely by senior management.

205.   As stated below, Defendants became aware of KUZMIAK's complaint to the FDIC and terminated his employment in retaliation for that complaint.

## PARK'S Whistleblower Activity.

206.    In the face of Defendants' increasing scrutiny and obstruction of their remediation efforts, PARK logged onto FDIC Connect in September, 2020 and lodged a complaint with the FDIC that his ability to remediate the violations identified in the ROE were being interfered with by the Korean Parent Banks and the Korean "Task Force."

207.    On January 5, 2021, PARK sent an email to Keith Tam, an enforcement officer at NYS DFS, alerting them of Defendants' ongoing violations of the BSA and AML law and regulations.

208.    PARK cited Defendants dismissing key employees and managers, the ongoing staff shortages, Defendants putting effective and urgent remediation projects "on hold" and their creation of a "hostile work environment." Id.

209.    PARK also cited CONSTANTIN for preventing him access to the senior management and CCOB meetings and his obstructing the remedial measures proposed by PARK in response to ROE issued in July, 2020.

210.    In this emailed complaint, PARK also wrote, "[t]his may be the last email to you since [CONSTANTIN] and [Defendant JI YOUNG YOOK] has [sic] interpreted the recent exit meeting as a green light to remove all the BSA managers. I am writing to inform you that CBSAO, Charles Constantin and the CCOB mentioned in passing at the December 22nd meeting that they are going to terminate my employment along with Catherine Ramos, Deputy BSAO and Eva Errico, OFAC Manager for no apparent reason but to save costs. No justification for these staff changes was provided, and this is consistent with the longstanding management practices of frequent personnel changes made without justification."

211.    By email, dated January 7, 2021, Plaintiff Park sent FDIC examiners Jill Cereghino and

Kathleen Connor-Wareham, and several others, an email in which he complained of Defendants'

BSA violations.

212.    In that January 7, 2021 email, PARK cited, among other things, CONSTANTIN's

inconsistent and poor leadership, the excessive turnover within the BSA Department, which has

not been "controlled or managed contributing to delayed and ineffective remediation efforts as

well as insufficient oversight of the suspicious activity monitoring and CDD programs."

213.    Plaintiff PARK also wrote that these deficiencies had resulted in "inconsistent oversight

and reemerging and continuing apparent violations of law and regulation cited in this Report."

### RAMOS' Whistleblower Activity

214.    By email, dated January 13, 2021, RAMOS sent an email to Jillian Cereghino, a FDIC

examiner, entitled "SHBA's BSA Department Deterioration," citing Defendants' extensive and

serious BSA violations.

215.    In that email, RAMOS cited the "turnover of management within the BSA department

and we have not been able to sustain the department since Charles Constantine took over. Many

members of his new team have no prior BSA experience. Many are from the Head office (expat)

and one is the Regulatory Liaison, Jennifer Kim; and she also has no BSA experience; but she

acts as the person managing the department (her title now is planning manager)." Id.

216.    RAMOS copied this email to several additional FDIC examiners, including Kathleen

Connor-Wareham.

217.    Meanwhile, on January 1, 2021, Defendant YOOK JI YOUNG was installed by

Defendant JIN OK DONG to replace Mr. Suh as SHBA's CEO.

218.    During the period November, 2020 and January, 2021, CONSTANTIN said during a meeting, "I wasn't brought in here to remediate the compliance issues. I was brought on to smooth things over with the examiners and get them off our backs."

### Defendants Unlawfully Discharge PARK and RAMOS

219.    On January 4, 2021, at PARK and RAMOS's request, CONSTANTIN met with PARK and RAMOS in CONSTANTIN's office.

220.    This meeting was ostensibly held to discuss the upcoming regulatory annual compliance exam by the FDIC/ NY DFS.

221.    PARK and RAMOS also wanted clarification of CONSTANTIN's statements at a meeting of the CCOB in December 2020 when he said he was going to discharge PARK and RAMOS before the upcoming exam.

222.    CONSTANTIN denied stating he was going to terminate their employment, but he added that, "I need my BSAO and Deputy BSAO on my side for the [upcoming annual] exam."

223.    CONSTANTIN then said to PARK, "I heard a rumor James that you are fucking Catherine and Jennifer Kim."

224.    Jennifer Kim was SHBA's Planning Manager and Regulatory Liaison.

225.    Ms. Kim was eight-months pregnant at that time.

226.    PARK and RAMOS were both so visibly shocked by this false accusation that neither were able to respond, and they abruptly ended the meeting and immediately left CONSTANTIN's office.

227.    This was not the first occasion that CONSTANTIN had made off-color and inappropriate comments that included racist and sexist comments.

228.    On many occasions, CONSTANTIN would utter expletives in front of Plaintiffs such as the word "fuck" to express his frustrations with management at SHBA and with the CCOB in particular.

229.    On another occasion, CONSTANTIN said about SHINHAN BANK Co., Ltd.'s upper management "these stupid Koreans have no experience in the US and have their own reality."

230.    CONSTANTIN emphasized the fact that it was SHINHAN BANK Co., Ltd. that managed and controlled SHBA.

231.    CONSTANTIN also expressed frustration at a board member, Kristi Keatinge, a twenty-nine-year veteran examiner of the FDIC, for asking "a hundred and five questions" and he complained she was "still acting like an examiner."

232.    After this January 4, 2021, meeting PARK approached Uhyun Nam, SHBA's HR Director/Manager, and complained to Mr. Nam about CONSTANTIN's offensive comments.

233.    PARK also asked Mr. Nam whether SHBA had decided to discharge him and RAMOS.

234.    Mr. Nam replied he did not know "anything about a termination."

235.    Mr. Nam promised to investigate CONSTANTIN's offensive comments.

236.    Soon after the January 4, 2021 meeting, RAMOS told PARK she was shocked and offended by CONSTANTIN's comments and was suffering from insomnia and nightmares.

237.    RAMOS also told PARK she was scared CONSTANTIN would approach her at any minute and that she felt uncomfortable working with him and being in the same workplace.

238.    RAMOS said she intended to file a formal complaint of sexual harassment to the HR Department and PARK agreed that reporting this incident to HR was necessary.

239.    On January 7, 2021, RAMOS spoke to SHBA's HR Department and said she wanted to file a complaint of sexual harassment against CONSTANTIN regarding his offensive comments.

240.    RAMOS was told to email the HR Department a written complaint.

241.    By email, dated January 7, 2021, RAMOS wrote, "I would like to formally file a sexual harassment complaint against CBSAO, Charles Constantine [sic], please see details and incident report form from the January 2020 Employee Handbook. Let me know if you have additional questions."

242.    RAMOS attached to that email a written statement detailing the offensive comment and adding that "I have thought about this for the past days because I am afraid of retaliation, but I need to speak up and report it. I have a family and James have a family as well. The statement is offensive and disrespectful…I would like to point out that this derogatory statement have [sic] caused me stress and anxiety, and made me uncomfortable at work."

243.    Mr. Nam immediately acknowledged receipt of RAMOS' complaint and wrote, "HR will internally investigate the case."

244.    Meanwhile, on January 12, 2021, PARK lodged his own sexual harassment complaint with New York City's Official Government website and the HR Department about CONSTANTIN's offensive comments and followed up with RAMOS' complaint.

245.    On January 12, 2021, Mr. Nam advised RAMOS by email that the HR Department had completed the investigation and determined that CONSTANTIN had "violated bank policy."

246.    Mr. Nam wrote that "the HR Committee has administered a disciplinary action (written warning) against him, which will impact the evaluation for performance and promotion, and further misconduct will result in termination."

247.    Mr. Nam also reminded RAMOS that SHBA has a "policy against retaliation" and that CONSTANTIN "has been ordered to take the training on sexual harassment at [sic] workplace."

248.   Upon information and belief, CONSTANTIN was merely required to take a sexual harassment online training.

249.   In response to this email, RAMOS wrote on January 12, 2021, "I have concerns that the action taken against the person I complaint [sic] of is not sufficient especially on the HR policy it is stated that there is "zero tolerance" on sexual harassment….[t]herefore, HR failed to provide safe and sound working environment by letting him get away with only written warning especially he is the head of the department who oversees many females."  RAMOS ended with, "I will find an alternative means to pursue the matter."

### NY DFS Enforcement Agents Hold an Emergency Meeting with Defendants.

250.   On February 17, 2021, NY DFS enforcement officers held a meeting with Defendants YOOK and CONSTANTIN.

251.   SHBA created minutes of this meeting, which were uploaded and stored on SHBA's "Goldwing" intranet platform.

### Defendants Discharge PARK and RAMOS

252.   On February 26, 2021, Mr. Nam advised PARK and RAMOS they were being discharged for "work performance issues."

253.   RAMOS asked for specific reasons why her employment was being terminated and Mr. Nam responded there were with six reasons stated in her discharge letter relating to her alleged poor performance and tardiness.

254.   RAMOS replied that these reasons were not true and Mr. Nam implicitly conceded that the reasons were false by nodding and smiling apologetically.

255.    Mr. Nam then added that the decision to terminate their employment came from "upper management" referring to the Korean Parent Banks, and notably, Defendant JIN OK DONG and the Upper Management of SHINHAN BANK Co., Ltd.

256.    Mr. Nam also said that SHBA's new CEO, Defendant YOOK JI YOUNG, was involved in the decision to discharge PARK and RAMOS.

257.    Mr. Nam handed PARK and RAMOS severance agreements providing for three months of severance each.

258.    The termination letters issued to PARK and RAMOS, both dated February 26, 2021, listed the following identical reasons for their discharge:

- "Failure to file SARs particularly with the COVID-19 batch closed backlog."
- "Lack of making improvements based on the matters pointed out during an Internal Audit."
- "Failure to file SARs and CTRs timely and accurately."
- "Lack of Supervision."
- "Lack of competency to handle FDIC & DFS examinations."
- "Violation of Attendance policy (tardy)."

259.    In truth, both PARK and RAMOS had been diligently fulfilling all duties on a timely and effective basis, despite obstruction and hostility from their superiors within SHBA such as CONSTANTIN.

260.    In truth, RAMOS had received an almost perfect score for all performance reviews performed by PARK.

261.    PARK rated RAMOS as "outstanding to excellent" and an almost perfect score of "5.0" in her year-end performance evaluation for 2019, which was issued in February 2020.

262.    PARK had completed the year-end annual performance evaluation for 2020 for RAMOS, and RAMOS's performance continued to be very good in all aspects.

263.    Similarly, PARK's work performance was exemplary, and his performance was rated outstanding to excellent in 2019 and 2020.

264.    Citing work performance issues was pretext for the real unlawful reasons motivating their discharge.

265.    In truth, CONSTANTIN dismissed PARK and RAMOS for their whistleblower activity and for protesting his sexual harassment and he did so under the direction of Defendant JIN OK-DONG, Ji Young Yook and SHBA's CCOB members.

266.    CONSTANTIN also discharged them to prevent PARK and RAMOS from alerting the FDIC and the NY DFS compliance examiners of program violations at the annual examination due to start on March 29, 2021.

267.    For example, a couple of hours after PARK and RAMOS were discharged and told to leave SHBA's premises, CONSTANTIN held a staff meeting with Brian Newman, SHBA's BSA/AML Transaction Monitoring Manager, Jorge Vasquez, SHBA's AVP, Team Lead AML Compliance, and Eva Errico, SHBA's BSA Manager.

268.    CONSTANTIN told those present he discharged PARK and RAMOS as he wanted to have a "different voice" at the looming joint FDIC and NY DFS examination.

269.    CONSTANTIN added that RAMOS' replacement would start that following Monday and that he was not going to hire a replacement for the position left vacant by PARK, adding that he thought "fewer people" were needed in the BSA department.

270.    This despite a recent consultant's staffing assessment that recommended SHBA increase its staff.

271.    PARK and RAMOS were discharged by decision of the CCOB who met on December 22, 2020.

272.    Defendants FRYE, KI MIN, O'MEARA and PAK, were all present at that Board meeting and were involved in and approved the decision to terminate their employment.

273.    During this meeting of the CCOB on December 22, 2020, CONSTANTIN stated, "My recommendation is to terminate both James and Catherine….Head office is also concerned [about BSA officers hiring people they have worked with previously] and they've asked me to be mindful of not bringing in people I worked with before because of bad experience with James [Park]."

274.    Defendant FRYE then stated, "I agree that it's time to move on from BSAO and trust your judgement to get someone in to get it done. Let's move on and move quickly through what we have."

275.    Discharging PARK and RAMOS was severely prejudicial to SHBA's looming FDIC/ NY DFS examination.

276.    Both were the most experienced BSA managers at SHBA and were the only managers in SHBA's compliance department who had previously been BSA officers and deputy BSA officers at US-regulated banks.

277.    Also, both had managed SHBA's BSA program since September 2019, whereas CONSTANTIN had only assumed his role on September 21, 2020.

278.    The ongoing FDIC/NY DFS examination was evaluating Defendants' BSA/AML practices between the period from September 30, 2019 to September 30, 2020.

279.    As PARK and RAMOS were the BSA leadership during the period currently under examination, they were the key managers able to informatively respond to examiners' concerns about the program.

**KUZMIAK's Additional Whistleblower Activity and His Discharge**

280.    Meanwhile, on February 12, 2021, KUZMIAK sent a complaint via FDIC connect to

FDIC Examiner, Jillian Cereghino, complaining of the fact that PARK had been usurped in his

role by CONSTANTIN.

281.    In that February 12, 2021 email, KUZMIAK also cited the fact that despite his role as

Head of the BSA Department, PARK was not permitted to attend CMC and CCOB meetings and

that was no longer receiving minutes of those committee meeting minutes.

282.    KUZMIAK added that "it appears to me, by Charles [Constantin]'s own admission, that

the bank does not have a functioning BSAO. Senior management is running the department." Id.

283.    On February 26, 2021, KUZMIAK wrote to Defendant YOOK, and SHBA's HR

Department, of the ongoing violations of COVID-19 safety directives and alerted the NY on

Pause Task Force of his concerns and the violations.

284.    On March 4, 2021, KUZMIAK was informed his employment at SHBA was being

terminated.

285.    Mr. Kumiak's letter of termination, dated March 4, 2021, informed him that he was being

dismissed due to:

- "Failure to manage a CTR Soft launch.
- Failure to analyze the Soft launch of the system.
- Failure to manage the Oracle AMR and AMS timely and accurately.
- Lack of competency in system operation.
- Lack of competency to handle FDIC and DFS examinations.
- Violation of Policy (Regulations) on attendance management."

286.    SHBA offered KUZMIAK just one month of severance pay.

287.    These foregoing reasons for discharging KUZMIAK were false.

288.    KUZMIAK's performance had been exemplary as evidenced by his performance

reviews.

289.    In reality, SHBA discharged KUZMIAK precisely because he had been fulfilling his duties and to prevent him from alerting the examiners of his analyses, including the analysis he had begun with ADAMSON on measuring the detection gap in transaction monitoring.

290.    The regulators had focused on transaction monitoring gaps in their Consent Order and were expected to focus on this again in the current exam.

291.    KUZMIAK's work revealed these detection gaps continued to be endemic at SHBA.

292.    SHBA discharged KUZMIAK also in retaliation for confronting CONSTANTIN with evidence of his false statements regarding the reasons for ADAMSON's discharge.

293.    In fact, after reading the transcript of the December 2020 CCOB meeting - in which CONSTANTIN claimed he had fired ADAMSON for not performing any work for the three months prior to his dismissal - KUZMIAK collated evidence of ADAMSON's extensive work during that period and confronted CONSTANTIN with the evidence.

## Conclusion

294.    By interfering with Plaintiff's independence, SHBA prevented them from completing remediation activity in violation of the BSA.

295.    The non-completion of Plaintiffs' remediation lead to significant and public regulatory enforcement actions.

296.    Upon information and belief, the CCOB did not review PARK's proposed CAP or CPP remediation plans that had been submitted as a required response to the ROE in their meetings in the fall of 2020.

297.    Plaintiffs' dismissal led to a further deterioration of SHBA's BSA program, proof of which is derived from the continuation of the Consent Order for failure to address the deficiencies.

298.    Removing Plaintiffs - SHBA's most senior compliance managers skilled in remediation and privy to the defects in SHBA's BSA program beginning in October 2020 and continuing until just four weeks before the exam - SHBA's motivations are obvious.

299.    Had PARK, RAMOS, ADAMSON and KUZMIAK remained employed at SHBA, the examiners would have been alarmed to discover that the same issues relating to independence and resources identified previously had become more acute, especially under Defendant YOUNG YOOK and CONSTANTIN's tenure.

300.    SHBA's unlawful actions and the timing of their discharge will cause PARK, RAMOS, ADAMSON and KUZMIAK untold reputational and economic damage and have caused, and will continue to cause, career set backs.

301.    Plaintiffs will forever be falsely associated with a deteriorating and highly defective compliance program.

302.    SHBA has been deliberately defiant of the Consent Order, including Article 2 requiring SHBA to "have and retain management qualified to oversee all aspects of SHBA's BSA/AML Compliance Program."

303.    Defendants' discriminatory and humiliating dismissal of Plaintiffs' valid concerns, in complete disregard of their years of experience as a Compliance Officers, was devastating.

304.    Plaintiffs remained personally responsible for Defendants' actions and were aware of actions taken against other Compliance Officers for failing to ensure adequate Bank Secrecy Act, OFAC and AML controls, and Defendants' potentially illegal transactions continued unabated.

305.    Defendants discharged Plaintiffs in retaliation for their communications with the Federal and State banking regulators and investigators of Defendants' violations of the BSA and other banking regulations.

306.    As a result of Defendants' unlawful conduct, RAMOS has suffered the adverse effects of

discrimination and the quality of her life, self-esteem and self-respect have been adversely

impacted because she was subjected to the intimidating and humiliating types of conduct

described here, all of which will continue into the future and remain a source of humiliation,

anguish, and financial loss to RAMOS.

307.    Defendants' acts were done with reckless indifference in the face of a perceived

risk that its actions would violate RAMOS and PARK's protected rights under the CHRL that, in

addition to all the damages inflicted upon RAMOS and in addition to all the measures of relief to

which RAMOS may properly be entitled herein, Defendants should also be required to pay

punitive damages as punishment for its discriminatory conduct, in order to deter Defendants and

others similarly situated from engaging in such conduct in the future.

308.    The Individual Defendants FRYE, DAE-KI MIN, O'MEARA, PAK and LEE SOON

YOO were all key members of the CCOB and hence were personally responsible for Defendants'

foregoing actions as they acquiesced, condoned, and tolerated the unlawful decisions of the other

individual Defendants.

309.    As stated below, in October, 2022, the Consent Order issued against SHBA in 2017 was

amended and restated and in its current form continues to support Defendants' violations

asserted here.

310.    The FDIC supervises more than 5,000 banks and rarely issues Consent Orders.

311.    For example, in 2017, the FDIC issued only three consent orders against banks for BSA

violations entities, of which SHBA - with assets valued at more than $1.9 billion – was by far the

largest institution.

312.    Banks receiving consent orders arising from BSA violations generally prioritize remediating them and as result most consent order are lifted and are done so within just over 2 years on average.

313.    Similarly, in 2018, the FDIC issued nine consent orders, all of which have now been lifted, meaning that the financial institutions who were the subjects of the consent orders have remedied the violations and deficiencies.

314.    Amended Consent Orders are are and are issued when a BSA program has deteriorated since the original Consent Order.

**The FDIC Amends and Restates a Consent Order in October, 2022.**

315.    By an Amended and Restated Consent Order, dated October 13, 2022 (the "2022 Consent Order"), the FDIC amended and restated the June 12, 2017 Consent Order, finding continuing and serious violations in SHBA's BSA/AML Compliance Program and its Countering the Financing of Terrorism Program ("CFT").

316.    The terms of the 2022 Consent Order fundamentally supports the facts underlying Plaintiffs' whistleblower causes of action asserted here and vindicates the Plaintiffs' assertions in most way.

317.    The key findings in the 2022 Consent Order include the FDIC's conclusions that:

- SHBA's governance is inadequate and its BSA staff need employment contracts to protect their independence.

- CCOB supervision was and continues to be inadequate and that the Korean Parent Banks and its Executives exercised effective control including informally bypassing the CCOB.

-  SHBA's transaction monitoring is defective and a new BSA officer is required to be hired to replace the current one.

- That Oracle FCCM was never validated and must be.

- That the FDIC will henceforth be reviewing and vetting new appointments of CCOB
  members.

318.   The 2022 Consent Order publishes the findings of the March 29, 2021 ROE (referenced above) for the period from September 30, 2019 through September 30, 2020, finding that PARK's independence was constrained by the actions of the Defendant Korean Parent Banks and that the CCOB did not effectively monitor and govern. Rather, the FDIC found that the CCOB's role was usurped the Defendants Korean Parent Bank leadership.

319.   The 2022 Consent Order proposes to remedy these governance failures by replacing the CCOB entirely and forcing the new Board member to be accountable through adding new members requiring extensive decision-making documentation and formal minutes and meeting recording.

320.   Section 2 of the 2022 Consent Order, regarding "Management," imposes the obligation for SHBA to undergo a "Management Study" by an outside third consultant that must, at a minimum, include a "review and analysis of the management and staffing needs of the Bank's AML/CFT Program; the corporate governance weaknesses and deficiencies identified in the March 29, 2021 Report of Examination issued jointly by the FDIC and the New York State Department of Financial Services (2021 ROE); and the abilities, experience, and other qualifications of the Bank's directors and all AML/CFT officers and staff (AML/CFT Personnel) to satisfactorily perform their present and anticipated duties, including their duty to ensure complete and timely compliance with the requirements of this ORDER."

321.   This Management Study is also tasked with "evaluating" whether the future appointed BSAO "existing or future directors and any AML/CFT Personnel should have written

employment agreements or other written commitments specifying their duties and responsibilities to the Bank; reporting and communication lines; performance and evaluation standards; and/or compensation and, if so, recommend actions to be taken to ensure appropriate written employment agreements are executed and/or other written commitments are in place."

322.    The foregoing requirement is support for the assertions herein that Defendants usurped Plaintiffs' roles and responsibilities, in particular, the Korean Parent Banks and their leadership.

323.    The FDIC concludes that "management is not clear" and the CCOB is not in authority or control and management has interfered with the BSA officer's decision-making.

324.    Regarding Board Supervision, Section 2 of the 2022 Consent Order provides, "The Board must immediately increase its supervision, direction, and oversight of the AML/CFT Personnel and AML/CFT Program; and consistent with the role and expertise expected for directors of banks of comparable size and risk, assume full responsibility for the approval and implementation of sound AML/CFT policies, procedures, and processes reasonably designed to assure and monitor the Bank's compliance with the Bank Secrecy Act, 31 U.S.C."

325.    FDIC has found that the board does not at present adequately govern SHBA and requires the board to "assume full responsibility."

326.    The Consent Order makes clear what Plaintiffs have alleged herein, which is that the Korean Parent Banks are in charge and that they have an informal control structure that bypasses the CCOB.

327.    As such, the 2022 Consent Order requires the Board minutes to "appropriately document all discussions and decisions, including executive sessions of the Board, made in conjunction with the Bank's parent companies, Shinhan Bank and/or Shinhan Financial Group (Parent

Companies)" and heightened and proper "Board oversight of all formal and informal communication between the Bank and the Parent Companies."

328.    The 2022 Consent Order found serious issues with SHBA's Transaction Monitoring, and that a wholesale system validation is required, i.e. that "[w]ithin 180 days from the effective date of this ORDER, the Bank must revise, and then appropriately validate, its system of internal controls to assure ongoing compliance with the BSA (AML/CFT Internal Controls) taking into account the deficiencies and weaknesses identified in the 2021 ROE."

329.    SHBA is required to implement "policies, procedures, and processes establishing when comprehensive reviews and validations of one or more of the systems used to monitor, detect, and file Required Reports are appropriate and how they will be conducted must be developed. Decisions to adjust or not adjust system parameters as a result of the reviews should be supported through a well-documented analysis with appropriate information consistent with the Bank's AML/CFT Program."

330.    The 2022 Consent Order imposes strict and wholesale personnel changes with SHBA's BSA/AML Management and Staff, notably, "[w]ithin 90 days from the effective date of this ORDER, the Bank must have a designated individual or individuals (AML/CFT Officer) responsible for coordinating and monitoring day-to-day compliance with the BSA with (i) qualifications commensurate with the size and complexity of the Bank's activities and operations; (ii) sufficient delegated authority; and (iii) an adequate level of appropriate resources (monetary, physical, and personnel) to assure compliance with the BSA and effectively administer the AML/CFT Program."

331.    Section 4 of the 2022 Consent Order cites SHBA's FCCM System as defective and requires "[w]ithin 90 days from the effective date of this ORDER, the Bank must ensure that a

validation of the Bank's suspicious activity monitoring system(s) (Validation Review) has been completed and the findings of the Validation Review are reflected in a written report (Validation Report). The Validation Review must, at a minimum, consider the deficiencies and weaknesses identified in the 2021 ROE regarding the Bank's suspicious activity monitoring system(s) and include testing of the effectiveness of established filtering criteria and thresholds and ensuring that the system(s) appropriately detects potentially suspicious activity and appropriately addresses identified deficiencies and weaknesses and the Validation Report must be submitted to the Deputy Regional Director for review and non-objection."

332.      The 2022 Consent Order requires in Section 5 that a "Lookback Review" be carried out of suspicious transactions from September 1 2020 to October 13, 2022, with the possibility that this might be extended to period June 13, 2017 to August 31, 2020. ("The Deputy Regional Director may, in his or her sole discretion, after reviewing the results of the Initial Look Back Review, provide written notification (Additional Look Back Review Notification) to the Bank requiring the review of all accounts and transaction activity from June 13, 2017, to August 31, 2020, by either the firm selected to do the Initial Look Back Review or another qualified firm proposed by the Bank and acceptable to the Deputy Regional Director (Additional Look Back Review Firm) to determine whether reportable transactions and suspicious activity involving any accounts or transactions within or through the Bank were properly identified and reported in accordance with the applicable reporting requirements (Additional Look Back Review)."

333.      Finally, the 2022 Consent Order requires all future members of the CCOB to be reviewed and vetted by the FDIC. ("Within 30 days from the effective date of this ORDER, the Board must provide the Deputy Regional Director with the names of the Bank's directors comprising its AML/CFT compliance committee (AML/CFT Compliance Committee). The AML/CFT

Compliance Committee must be comprised of directors acceptable to the Deputy Regional
Director with a majority of directors not having been and not being involved in the daily
operations of the Bank.")

334.    An article in the Wall Street Journal, published November 28, 2022, entitled "Shinhan
Financial's U.S. Unit Ordered to Beef Up Money Laundering Oversight", wrote that SHBA
"agreed to ensure that its AML program was sufficiently capable of combating the risk of money
laundering, after the FDIC in 2021 found deficiencies and weaknesses, according to an FDIC
order issued in October and made public Friday." See article:

https://www.wsj.com/articles/shinhan-financials-u-s-unit-ordered-to-beef-up-money-laundering-oversight-11669417664.

335.    The article continued, "the FDIC order requires Shinhan Bank America to retain a third
party to review the management and staffing of its AML program, and directs the bank's board
to immediately increase its oversight of the program. Additionally, Shinhan was ordered to
ensure it has accurately assessed its risks and to revise its internal controls. The FDIC also
ordered Shinhan Bank America to adopt an effective training program to educate its staff on
AML policies and to validate its suspicious-activity monitoring system. The bank must review
transactions from September 2020 onward for suspicious activity, and could be ordered to review
transactions dating back to 2017." Id.

336.    Finally, the article cites a lawsuit by Gu Seon Song, SHBA's former Chief Audit
Executive, who sued SHBA in 2021 in a lawsuit brought in the SDNY for allegedly firing him
after he refused to downplay the weaknesses in the bank's AML program. Id.

337.    The article added, "Mr. Song in his lawsuit said the then-chief executive of Shinhan Bank
America demanded that he alter an internal audit report's conclusion that Shinhan Bank America

had an unsatisfactory AML program. That report, which was produced following the FDIC's 2017 order, attributed the alleged problems to inappropriate management oversight and a high turnover in the office supervising the program, Mr. Song said. Mr. Song said he later submitted the negative report to an FDIC examiner and was subsequently fired. He sued the bank under a U.S. law that protects bank staff from retaliation if they engage in whistleblowing." Id.

### FIRST CAUSE OF ACTION:

### VIOLATION OF THE AMLA, 31 U.S.C. § 5323, *et seq.*, AGAINST SHINHAN FINANCIAL GROUP CO., LTD., SHINHAN BANK Co., Ltd and THE INDIVIDUAL DEFENDANTS

338.    Plaintiffs repeat, re-allege, and incorporate in full paragraphs 1 through 337 of this Complaint, as though fully set forth herein.

339.    At all relevant times mentioned herein, SHINHAN FINANCIAL GROUP CO., LTD. and SHINHAN BANK Co., Ltd were "financial institutions" under the AMLA who were banking within the jurisdiction of the United States.

340.    The information Plaintiffs provided to the regulators regarding possible violations of various laws and regulations by Defendants, including violations of The Bank Secrecy Act, 31 U.S.C. § 5311, *et seq.*, was a protected activity of which Defendants were well aware.

341.    Defendants' above-mentioned acts constitute unlawful whistleblower discrimination against Plaintiffs in violation of the AMLA, which prohibits financial institutions from discharging or otherwise discriminating against an employee because the employee (or any person acting pursuant to the request of the employee) provided information to any federal supervisory agency regarding a possible violation by the financial institution or any director, officer or employee of the financial institution of certain specified laws.

342.    Defendants took adverse action against Plaintiffs "because" they "provided information" to the state and federal regulators regarding a "possible" violation of the Bank Secrecy Act, which culminated in their discharge so that Defendants are liable pursuant to 31 U.S.C. §5328(a).

343.    As a proximate result of Defendants' conduct, Plaintiffs have been adversely affected in their employment, career, well-being, the quality of their lives, and in their normal life's pursuits.

344.    Plaintiffs believe Defendants' conduct has and will continue to have an irreparable effect upon their career and the quality of their lives.

345.    Plaintiffs therefore seek all remedies that are available to them under AMLA, including "compensatory damages," 31 U.S.C. §5323, *et seq.,* in an amount to be determined at trial.

346.    The individually-named Defendants are personally liable for their own unlawful acts pursuant to the AMLA, are liable as agents of the corporate defendants and for condoning the unlawful acts of their fellow Defendants.

347.    Defendants acts were so reprehensible and done with reckless indifference in the face of a perceived risk that its actions would violate Plaintiffs' protected rights that, in addition to all the damages inflicted upon Plaintiffs and in addition to all the measures of relief to which Plaintiffs may properly be entitled herein, Defendants should additionally be required to pay punitive damages as punishment for its unlawful conduct, in order to deter Defendants and others similarly situated from engaging in such conduct in the future.

## SECOND CAUSE OF ACTION:

### (AGAINST SHBA AND THE INDIVIDUAL DEFENDANTS FOR VIOLATIONS OF THE FIRREA ANTI-RETALIATION PROVISIONS)

348.    Plaintiffs repeat, re-allege, and incorporate in full paragraphs 1 through 347 of this Complaint, as though fully set forth herein.

349.    At all relevant times mentioned herein, SHBA was an FDIC insured "financial institution" for the purposes of the FIRREA.

350.    Plaintiffs allege that SHBA, through its agents and officers, terminated their employment in violation of 12 U.S.C. § 1831j(a), which prohibits a federally insured depository institution from discharging or discriminating against an employee who provides information to any federal banking agency regarding a violation of any law or regulation by the depository institution or any of its officers, directors, or employees.

351.    The information Plaintiffs provided to the regulators regarding possible violations of various laws and regulations by Defendants, including violations of The Bank Secrecy Act, 31 U.S.C. § 5311, *et seq.*, was a protected activity of which Defendants were aware.

352.    Defendants' above-mentioned acts of constitute unlawful whistleblower discrimination against Plaintiffs in violation of the FIRREA, which prohibits financial institutions from discharging or otherwise discriminating against an employee because the employee (or any person acting pursuant to the request of the employee) provided information to any federal supervisory agency regarding a possible violation by the financial institution or any director, officer or employee of the financial institution of certain specified laws.

353.    Defendants took adverse action against Plaintiffs "because" they "provided information" to the state and federal regulators regarding a "possible" violation of the Bank Secrecy Act, which culminated in their discharge so that Defendants are liable pursuant to FIRREA.

354.    The individually-named Defendants are personally liable for their own unlawful acts pursuant to FIRREA, are liable as agents of the corporate defendants and for condoning the unlawful acts of their fellow Defendants.

355.     Plaintiffs therefore seek all remedies that are available to them under FIRREA, including compensatory damages in an amount to be determined at trial.

356.     Defendants acts were so reprehensible and done with reckless indifference in the face of a perceived risk that its actions would violate Plaintiffs' protected rights that, in addition to all the damages inflicted upon Plaintiffs and in addition to all the measures of relief to which Plaintiffs may properly be entitled herein, Defendants should additionally be required to pay punitive damages as punishment for its unlawful conduct, in order to deter Defendants and others similarly situated from engaging in such conduct in the future.

## THIRD CAUSE OF ACTION:

## (ON BEHALF OF RAMOS FOR GENDER DISCRIMINATION AND RETALIATION IN VIOLATION OF CHRL)

357.     RAMOS repeats, re-alleges and incorporates in full paragraphs 1 through 356 of this Complaint, as though fully set forth at length herein.

358.     The entirety of the acts which constitute and form this cause of action, as set forth above, all of which are deemed repeated and re-alleged herein, as though said paragraphs were specifically set forth herein, were perpetrated upon RAMOS while she was in the course of her employment with Defendants

359.     Defendants subjected RAMOS to a sexually hostile work environment due to her gender.

360.     Defendants treated RAMOS less well because of her gender and took adverse employment actions against her, which culminated in her discharge, all of which was permitted and condoned by Defendants.

361.     Defendants retaliated against RAMOS when she opposed the sexually hostile work environment by, among other things, lodging a complaint with SHBA's HR Department against CONSTANTIN.

362.    RAMOS was caused to suffer financial loss and emotional injuries because of Defendants' discriminatory conduct in violation of RAMOS' rights under the CHLR.

363.    The foregoing acts constitute unlawful gender discrimination and retaliation against RAMOS in violation of the CHRL.

364.    As a result of Defendants' violation of the CHLR, Defendants are liable to RAMOS for damages, including punitive damages, and attorneys' fees.

365.    As a proximate result of Defendants' conduct, RAMOS has been adversely affected in her employment, career, well-being, the quality of her life and in her normal life's pursuits.

366.    Defendants' conduct was reprehensible and done with reckless indifference in the face of a perceived risk that its actions would violate RAMOS's protected rights under the CHRL, which renders Defendants liable to pay punitive damages to deter them and others similarly situated from engaging in such conduct in the future.

367.    RAMOS seeks compensatory damages and punitive damages plus the costs of this action as well as reasonable attorney's fees.

## **FOURTH CAUSE OF ACTION:**

### **(ON BEHALF OF PLAINTIFF PARK FOR RETALIATION IN VIOLATION OF CHRL)**

368.    PARK repeats, re-alleges, and incorporates in full paragraphs 1 through 367 of this Complaint, as though fully set forth at length herein.

369.    Defendants retaliated against PARK by terminating his employment after he engaged in protected activity, namely after he lodged a complaint of gender-based sexual harassment against CONSTANTIN, including in connection with CONSTANTIN's sexually offensive comments and conduct towards RAMOS.

370.     PARK was caused to suffer financial loss and emotional injuries because of Defendants' retaliation conduct in violation of his rights under the CHLR.

371.     The foregoing acts constitute unlawful retaliation in violation of the CHRL.

372.     As a result of Defendants' violation of the CHLR, Defendants are liable to Plaintiff of "damages, including punitive damages," and attorneys' fees.

373.     As a proximate result of Defendants' conduct, PARK has been adversely affected in his employment, career, well-being, the quality of his life and in his normal life's pursuits.

374.     Defendants' conduct was reprehensible and done with reckless indifference in the face of a perceived risk that its actions would violate PARK's protected rights under the CHRL, which renders Defendants liable to pay punitive damages to deter them and others similarly situated from engaging in such conduct in the future.

375.     PARK seeks compensatory damages and punitive damages plus the costs of this action as well as reasonable attorney's fees.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs demands judgment against Defendants for compensatory damages, punitive damages plus pre-judgment interest, the costs of this action and reasonable attorney's fees as is permitted under the law, and for such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury.

Dated:          February 7, 2023

**LAW OFFICES OF IAN WALLACE, PLLC**

By:       _____

Ian F. Wallace (IW: 3100)
*Attorney for Plaintiff*
501 Fifth Avenue – 19th Floor
New York, N.Y. 10017
(212) 661-5306