UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X
                                                        :
JAMES PARK, *et al.*,                                   :
                                                        :
                              Plaintiffs,               :
                                                        :                22-CV-10331 (VSB)
            - against -                                 :
                                                        :                **OPINION & ORDER**
                                                        :
SHINHAN BANK AMERICA, *et al.*                          :
                                                        :
                              Defendants.               :
                                                        :
--------------------------------------------------------X

<u>Appearances</u>:

Ian Francis Wallace
Law Offices of Ian Wallace, PLLC
New York, NY
*Counsel for Plaintiffs*

Lincoln Owens Bisbee
Carolyn Corcoran
Lucas Hakkenberg
Morgan, Lewis & Bockius LLP
New York, NY
*Counsel for Defendants*

<u>VERNON S. BRODERICK, United States District Judge</u>:

        Before me are three motions:  (1) Defendants'[1] motion to dismiss the First Amended

---

[1] The term "Defendants" refers collectively to Shinhan Bank America, Charles Constantin ("Constantin"), Daniel E. Frye ("Frye"), Walter O'Meara ("O'Meara"), Dae-Ki Min ("Min"), Ryan Pak ("Pak"), and Ji Young Yook ("Yook").  Although the operative complaint has named "Shinhan Financial Group Co., Ltd.", "Shinhan Bank Co. Ltd.", Jin Ok-Dong, Jung Ji Ho, Kang Shin Tae, and Lee Soon Yoo (collectively, the "Non-Served Defendants"), they have not been served or otherwise appeared in this action.  *See Rutherford v. Fla. Union Free Sch. Dist.*, No. 16-CV-9778, 2019 WL 1437823, at *19 (S.D.N.Y. Mar. 29, 2019) ("A district court lacks personal jurisdiction over those defendants not properly served." (citing *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 59 (2d Cir. 2012))); *Jackson v. Broad. Music, Inc.*, No. 04-CV-5948, 2006 WL 250524, at *1 (S.D.N.Y. Feb. 1, 2006) ("Michael Jackson, who is named as a defendant, has not been served and is therefore not a party to this action."), *aff'd*, No. 06-2283-CV, 2007 WL 2914516 (2d Cir. Oct. 5, 2007).

Complaint[2], (Doc. 15); (2) Defendants' motion to compel arbitration and stay this action, (Doc. 43); and (3) Plaintiffs'[3] motion to amend the First Amended Complaint, (Doc. 55).  For the reasons stated below, Defendants' motion to dismiss the First Amended Complaint is GRANTED, Defendants' motion to compel arbitration is DENIED, and Plaintiffs' motion for leave to file a second amended complaint is DENIED as futile.

## I.    **Factual Background**[4]

Defendant Shinhan Financial Group Co., Ltd. ("SHFG") is a holding company based in South Korea.  (Doc. 8 ("FAC") ¶ 13.)  Shinhan Bank Co. Ltd ("SHB") is a wholly owned subsidiary of SHFG.  (*Id.* ¶ 14.)  Shinhan Bank America ("SHBA") is a wholly owned subsidiary of SHFG, and has headquarters in New York and branches throughout the United States.  (*Id.* ¶ 15.)  I will refer to SHFG and SHB collectively as the "Korean Parent Banks."

Plaintiffs are former employees of SHBA.  (FAC ¶¶ 9–12.)  From September 3, 2019 until February 26, 2021, James Park ("Park") was Senior Vice President and Bank Secrecy Act Officer ("BSA Officer" or "BSAO").  (*Id.* ¶ 9.)  From September 9, 2019 until February 26, 2021, Ramos was First Vice President Deputy BSA Officer.  (*Id.* ¶ 10.)  From November 12, 2019 until October 9, 2020, Adamson worked as First Vice President Anti-Money Laundering ("AML") Systems and Advisory.  (*Id.* ¶ 11.)  From January 15, 2020 until March 4, 2021,

---

[2] I consider the merits of the motion to dismiss in light of the Proposed Second Amended Complaint.  (Doc. 56-1.) *See Guan v. Lash Princess 56 Inc.*, No. 22-CV-2552, 2023 WL 2242050, at *3 (S.D.N.Y. Feb. 27, 2023) ("Where plaintiffs seek to amend their complaint while a motion to dismiss is pending, a court has a variety of ways in which it may deal with the pending motion to dismiss, from denying the motion as moot to considering the merits of the motion in light of the amended complaint." (internal quotation marks and citation omitted)).

[3] The term "Plaintiffs" refers collectively to James Park ("Park"), Geoffrey Adamson ("Adamson"), Catherine Ramos ("Ramos"), and Michael Kuzmiak ("Kuzmiak").

[4] The facts contained in this section are based upon the factual allegations set forth in the First Amended Complaint, (Doc. 8), and the Proposed Second Amended Complaint, (Doc. 56-1).  I assume the allegations in the complaints to be true in considering the motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6).  *Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 237 (2d Cir. 2007).  My reference to these allegations should not be construed as a finding as to their veracity, and I make no such findings.

Kuzmiak worked as Vice President AML Systems and Advisory.  (*Id.* ¶ 12.)

### A.  *SHBA's BSA/AML Program*

On June 12, 2017, SHBA entered into a Consent Order with the Federal Deposit Insurance Corporation ("FDIC") regarding SHBA's BSA/AML Compliance Program.  (FAC ¶¶ 52, 315.)  The Consent Order required SHBA, among other things, to "increase its supervision and direction" of its BSA/AML Compliance Program and to "have and retain management qualified to oversee all aspects of" that Program.  (*Id.* ¶¶ 54–55.)  In September of 2019, Plaintiff Park was hired as SHBA's BSA Officer.  (*Id.* ¶ 69.)  Plaintiffs Ramos, Adamson, and Kuzmiak were hired soon after.  (*Id.* ¶¶ 70, 72.)

Prior to entering into the Consent Order, SHBA used a system called BAM+ to detect suspicious cash transactions.  (FAC ¶¶ 81–83.)  As a result of the Consent Order's findings that "SHBA's internal controls and the transaction monitoring" were "defective," SHBA adopted a new transaction monitoring system, Oracle's Financial Crime and Compliance Management ("FCCM") suite.  (*Id.* ¶¶ 86–87.)  Oracle is a third-party company.  (*Id.* ¶ 86.)  Park and his team were responsible for the transition from the BAM+ system to the FCCM suite.  (*Id.* ¶ 88.)  As part of their duties, Park and his staff engaged in "parallel testing" both systems to identify any gaps in detection coverage of suspicious transactions.  (*Id.* ¶ 89.)

On July 1, 2020, SHBA's then-CEO required Park to "go live" with the FCCM system. (FAC ¶ 90.)  Park was ordered to move forward with the transition despite his request to delay implementation of the FCCM system because parallel testing had not yet been completed.  (*Id.* ¶¶ 91–92.)  The premature decision to go live with the FCCM system caused problems that were exacerbated by the fact that SHBA's IT department "lacked the experience, skills and training to oversee and maintain the [FCCM] system."  (*Id.* ¶ 107.)  Park and Adamson accordingly sought

to outsource the migration efforts to Oracle, but were told that the outsourcing efforts were too costly. (*Id.* ¶¶ 108–09.) In late 2020, another vendor performed parallel testing and found "an alarmingly large detection gap" in the FCCM system's coverage compared to the one provided by BAM+. (*Id.* ¶ 114.)

Park was also responsible for drafting SHBA's responses to the Examiner's[5] Report of Examination ("ROE") in 2020. (FAC ¶ 93.) The ROE required SHBA to, among other things, extract data related to cash alerts that BAM+ had previously missed, and other missed transactions. (*Id.* ¶ 94.) The requests by Park and Adamson to SHBA senior management to approve the data extraction were repeatedly denied, although it was ultimately approved. (*Id.* ¶¶ 81–85.) Adamson and Kuzmiak analyzed the data and identified "many large cash transactions [that] had moved through SHBA completely undetected." (*Id.* ¶ 99.) Adamson also asked SHBA's legal counsel to approve a request to engage an external consulting firm to conduct a "look-back review" of "previously undetected transactions." (*Id.* ¶¶ 102–03.) Adamson received a response stating that the "'Legal Department was asked by the Parent Bank team to hold off' on all projects." (*Id.* ¶ 104.)

Park's draft response to the ROE included a Comprehensive Action Plan ("CAP") and a subsequent Comprehensive Project Plan ("CPP") that described SHBA's planned remediation efforts. (FAC ¶ 122.) Adamson was also a "key contributor to both the CAP and CPP." (*Id.* ¶ 123.) The draft response contained most of the same recommendations Park had made to improve the BSA department. (*Id.* ¶ 124.) Around August and September 2020, Park sent the draft response to SHBA's Compliance Committee of the Board ("CCOB"), SHBA's senior

---

[5] Although the FAC is not clear, I presume this refers to the FDIC's Examiner.

managers, managers at SHBA's parent company SHB, and members of the "Task Force."[6]  (*Id.* ¶¶ 119, 125.)  However, the Task Force modified the draft response to "dilute the measures laid out" by Park, before it was sent to the FDIC and the New York Department of Financial Services ("NY DFS").  (*Id.* ¶ 126.)  At the same time, members of the Task Force engaged in increased surveillance of BSA team members, including by joining BSA team meetings.  (*Id.* ¶¶ 132–35.)

"[B]y email, dated September 3, 2020, ADAMSON emailed six managers, including Paul Park,[7] recommending that Jim Richards be appointed to SHBA's Board and the CCOB."  (FAC ¶ 165.)  Richards had previously been Wells Fargo's BSA Officer for 13 years.  (*Id.* ¶ 167.)  Although Paul Park interviewed Richards, he refused to schedule Richards for an interview with more senior management, and he eventually did not recommend Richards for a position.  (*Id.* ¶¶ 168–71.)

On September 21, 2020, SHBA hired Charles Constantin as the Chief BSA Officer.  (FAC ¶ 136.)  Constantin was made Park's direct supervisor, and Park was thereafter excluded from meetings with the CCOB.  (*Id.* ¶¶ 139, 142.)  In November 2020, the BSA department received an "Unsatisfactory" rating by SHBA's internal audit department.  (*Id.* ¶ 148.)  That report contained 21 findings regarding the Unsatisfactory rating.  (*Id.* ¶¶ 144–45.)  Park informed Constantin that the audit department was mistaken, and that all 21 of the audit findings had previously been corrected or remediated.  (*Id.*)  Although Constantin attended three meetings with the auditors, Constantin neither invited Park to the meetings nor advised the auditors of Park's evidence that the auditors' findings were incorrect.  (*Id.* ¶¶ 146–47.)

---

[6] The "Task Force" comprised several managers sent from SHB in Korea "to oversee SHBA's response to the ROE" after the 2017 Consent Order was extended in 2020.  (FAC ¶¶ 118–21.)

[7] Paul Park (not to be confused with Plaintiff James Park) was "the Senior Expat Korean employee in the BSA Department" at SHB.  (FAC ¶ 160.)

**B.** *Alleged Whistleblower Activity*

**1. Adamson**

Adamson made various complaints involving health and safety issues, as well as alleged BSA violations.  For example, in January and February 2020, Adamson made an internal complaint about fire safety issues in SHBA's building.  (FAC ¶ 155.)  Adamson was told by SHBA's Chief Operating Officer "not to complain again."  (*Id.* ¶ 156.)  As another example, in March 2020, Adamson emailed SHBA's legal department about violations of COVID-related policies.  (*Id.* ¶ 158.)  Adamson forwarded that email to Plaintiffs as well as other SHBA employees, explaining that SHBA was obligated by the FDIC to follow COVID-related policies.  (*Id.* ¶¶ 159.)  Adamson also sent to Park and Ramos, as well as Paul Park, a draft email regarding the FDIC's COVID-related policies that SHBA supposedly violated.  (*Id.* ¶ 160.)  That draft email was eventually forwarded to SHBA's CEO and other senior leaders.  (*Id.* ¶ 161.)  Adamson made another complaint about COVID-related policies in October 2020.  (*Id.* ¶¶ 182–86.)

Relevant to alleged BSA violations, on September 14, 2020, Adamson used his SHBA email address to register with FDIC Connect, an online portal for FDIC-insured institutions to communicate with the FDIC.  (FAC ¶¶ 173–75.)  On September 16, 2020, Adamson emailed certain FDIC enforcement agents who had previously performed a bank examination of SHBA and alerted them to the BSA department's inadequacies due to senior management's "refusal by endless delay to providie [sic] the required resources and constraints on the independence," and the Korean Parent Banks' control and interference, and requested, among other things, "FDIC supervision . . . to enforce the direction of the ROE on SHBA."  (*Id.* ¶¶ 176–79.)  Adamson then forwarded this email to the other Plaintiffs and to other members of the BSA team.  (*Id.* ¶ 180.)

On September 21, 2020, Adamson uploaded another complaint letter to FDIC Connect regarding the Korean Parent Banks' "direct control at least over BSA members" through the Task Force. (*Id.* ¶ 181.)

### 2. Kuzmiak

On September 20, 2020, Kuzmiak emailed FDIC examiners about the BSA department's lack of resources, Plaintiff Park's reduced role over time, and the premature migration to FCCM. (FAC ¶ 203–04.)  On February 12, 2021, Kuzmiak emailed an FDIC examiner stating that Plaintiff Park "had been usurped in his role by CONSTANTIN."  (*Id.* ¶ 280.)  On February 26, 2021, Kuzmiak also made an internal complaint about violations of COVID-related policies.  (*Id.* ¶ 283.)

### 3. Park

In September 2020, Park made a complaint on FDIC Connect regarding interference from the Korean Parent Banks and the Task Force.  (FAC ¶ 206.)  On January 5, 2021, Park emailed a NY DFS enforcement officer about Defendants' alleged BSA/AML violations.  (*Id.* ¶ 207.)  This email highlighted resource constraints and the dismissal of important employees, as well as Constantin's obstruction of Park's recommendations to senior management.  (*Id.* ¶¶ 208–09.) Notably, Park's email stated that "Constantin and the CCOB mentioned in passing at the December 22nd meeting that they are going to terminate my employment along with Catherine Ramos . . . for no apparent reason but to save costs."  (*Id.* ¶ 210.)  Next, on January 7, 2021, Park emailed FDIC examiners a complaint of Defendants' alleged BSA violations, including Constantin's actions and personnel retainment issues.  (*Id.* ¶¶ 211–13.)  Finally, Park lodged complaints of sexual harassment to a SHBA Human Resources manager as well as the "New York City's Official Government website" against Constantin for sexually offensive comments

he had made to Ramos. (*Id.* ¶¶ 232 ("After this January 4, 2021, meeting PARK approached Uhyun Nam, SHBA's HR Director/Manager, and complained to Mr. Nam about CONSTANTIN's offensive comments."); ¶ 244 (describing Park's complaint with the New York City government and SHBA's HR department); ¶ 369 (claiming Park was terminated for his sexual-harassment complaint against Constantin).)[8]

### 4. Ramos

On January 13, 2021, Ramos emailed FDIC examiners about Defendants' alleged BSA violations, including the "turnover of management within the BSA department," particularly since Constantin joined as leadership. (FAC ¶¶ 214–15.) Ramos also emailed a sexual-harassment complaint against Constantin on January 7, 2021 for his comments against her during their January 4, 2021 meeting. (*Id.* ¶¶ 239–43.)

### C. *Alleged Retaliation*

Plaintiffs claim they faced retaliation in several ways, most notably termination of their employment. For example, Adamson seems to claim that his employment was terminated because of his fire-safety and COVID-related complaints, as well as BSA-related complaints to the FDIC and the NY DFS. However, his October 9, 2020 termination letter explained that his employment was being terminated because of a "divisional restructuring" of the BSA/AML program. (FAC ¶ 187.) During a meeting in December 2020 of the CCOB, Constantin claimed that "he fired Adamson for not logging into SHBA's systems for three months." (*Id.* ¶ 190.) Despite Plaintiff Park's objections to the termination of Adamson's employment, Adamson was not rehired. (*Id.* ¶¶ 191–92, 196.) As another example, Adamson claims that, as a result of his

---

[8] On January 4, 2021, Constantin met with Park and Ramos to discuss upcoming regulator exams with the FDIC and the NY DFS. (FAC ¶¶ 219–20.) At that meeting, Constantin said to Plaintiff Park, "I heard a rumor James that you are fucking Catherine [Ramos] and Jennifer Kim," another SHBA employee. (*Id.* ¶¶ 223–24.)

complaints regarding fire safety and COVID-related policies, Plaintiffs and the BSA department overall faced increased surveillance from Korean expats sent by the Korean Parent Banks SHFG and/or SHB.  (*Id.* ¶ 162.)

Second, Kuzmiak was informed by a letter on March 4, 2021 that his employment was terminated.  (FAC ¶ 284.)  The letter described several reasons for the termination, including, among other things, "[l]ack of competency in system operation" and "[l]ack of competency to handle FDIC and DFS examinations."  (*Id.* ¶ 285.)  Prior to termination, Kuzmiak received positive performance reviews.  (*Id.* ¶ 288.)  Kuzmiak claims that his employment was terminated because he emailed a complaint to the FDIC on September 20, 2020, (*id.* ¶ 205), and because he confronted Constantin with evidence contradicting the reasons for the termination of Adamson's employment, namely "for not performing any work for the three months prior to [Adamson's] dismissal," (*id.* ¶¶ 292–93).

Finally, Park and Ramos were both notified on February 26, 2021 that their employment would be terminated for "work performance issues."  (FAC ¶ 252.)  Based on Constantin's recommendation, the CCOB decided to terminate their employment at their December 22, 2020 meeting.  (*Id.* ¶¶ 271–74.)  Prior to termination, Park and Ramos had received positive performance reviews.  (*Id.* ¶¶ 259–63.)  However, Park and Ramos received termination letters that provided "identical reasons" for the termination of their employment, including, among other things, failure to file suspicious activity reports, "'[l]ack of making improvements based on the matters pointed out during an Internal Audit,'" and "'[l]ack of competency to handle FDIC & DFS examinations.'"  (*Id.* ¶ 258.)  After their employment was terminated, Constantin made comments at a staff meeting that "he discharged PARK and RAMOS as he wanted to have a 'different voice' at the looming joint FDIC and NY DFS examination."  (*Id.* ¶ 267–68.)

## II.    **Procedural History**[9]

On December 6, 2022, Plaintiffs filed their initial complaint.  (Doc. 1.)  On February 8, 2023, Plaintiffs filed the First Amended Complaint ("FAC").  (Doc. 8.)  On June 8, 2023, the Defendants filed their motion to dismiss the FAC pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), (Doc. 15), and a supporting memorandum of law, (Doc. 16 ("MTD Mem.").)  On August 7, 2023, Plaintiffs filed a motion in opposition to the motion to dismiss and sought leave to file an amended complaint, (Doc. 21), a supporting affirmation, (Doc. 22), and a supporting memorandum of law, (Doc. 23 ("MTD Opp'n")).  On September 8, 2023, the Defendants filed a memorandum of law opposing the motion for leave to amend and in further support of their motion to dismiss, (Doc. 26), and a supporting declaration, (Doc. 27).  On October 17, 2023, Plaintiffs filed a reply memorandum of law in support of their motion for leave to amend the complaint.  (Doc. 30.)

On January 17, 2025, while the motion to dismiss was pending, Defendants filed a motion to compel arbitration and stay this action, (Doc. 43), and a supporting memorandum of law, (Doc. 44 ("MTC Mem.").)  On April 17, 2025, Plaintiffs filed a motion to amend the FAC, (Doc. 55); a supporting affirmation, (Doc. 56), which included the proposed second amended complaint, (Doc. 56-1 ("Proposed Second Amended Complaint" or "PSAC")), and two supporting affidavits, (Docs. 57–58).  That same day, Plaintiffs filed an omnibus memorandum of law in opposition to Defendants' motion to compel arbitration and in support of Plaintiffs' motion for leave to amend the FAC.  (Doc. 59 ("Omnibus Opp'n").)[10]  On May 30, 2025,

---

[9] I only describe the procedural history relevant to the instant motions.

[10] In that omnibus memorandum of law, Plaintiffs noted that their "motion to amend, dated August 7, 2023 [DN 21] is now moot and replaced by the current motion."  (Omnibus Opp'n 1 n.1.)  On April 18, 2025, I accordingly denied the previous motion to amend, Document 21, as moot.  (Doc. 60.)

Defendants filed a memorandum of law in opposition to the motion for leave to amend, (Doc. 63 ("Am. Opp'n")), and a reply memorandum of law in further support of their motion to compel arbitration, (Doc. 64).  On June 30, 2025, Plaintiffs filed a reply memorandum of law in support of their motion to amend the FAC, (Doc. 66), a supporting affirmation, (Doc. 65), and two supporting affidavits, (Docs. 67–68).  On July 9, 2025, Defendants filed a letter requesting I disregard certain arguments Plaintiffs made in their reply brief in further support of their motion for leave to amend.  (Doc. 71.)  On July 11, 2025, Plaintiffs filed an affirmation containing a notarized and signed version of an affidavit that Plaintiff Kuzmiak previously filed as Document 68.  (Doc. 72.)  On July 21, 2025, Plaintiffs filed a letter in response to Defendants' July 21, 2025 letter regarding the propriety of Plaintiffs' arguments made in their reply brief.  (Doc. 73.)

### III.  Legal Standards

#### A.  *Motion to Compel Arbitration*

The Federal Arbitration Act ("FAA") provides that "[a] party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition [a] United States district court . . . for an order directing that such arbitration proceed in the manner provided for in such agreement."  9 U.S.C. § 4.  "When considering a motion to compel arbitration, courts must resolve two questions: '(1) whether the parties agreed to arbitrate, and, if so, (2) whether the scope of that agreement encompasses the claims at issue.'" *Dowe v. Leeds Brown L., P.C.*, 419 F. Supp. 3d 748, 756 (S.D.N.Y. 2019) (quoting *Holick v. Cellular Sales of N.Y., LLC*, 802 F.3d 391, 394 (2d Cir. 2015)).

However, a party can waive its right to arbitration.  To determine whether a party has waived arbitration, courts ask whether that party "knowingly relinquish[ed] the right to arbitrate by acting inconsistently with that right."  *Morgan v. Sundance, Inc.*, 596 U.S. 411, 419 (2022).

11

### B. *Leave to Amend*

"Federal Rule of Civil Procedure 15(a) provides that leave to amend shall be freely given when justice so requires." *In Re Shanda Games Ltd. Sec. Litig.*, 128 F.4th 26, 59 (2d Cir. 2025) (internal quotation marks omitted). Even so, leave to amend can be denied for, among other things, futility. *See Ruotolo v. City of New York*, 514 F.3d 184, 191 (2d Cir. 2008) (citation modified). "Where plaintiffs seek to amend their complaint while a motion to dismiss is pending, a court has a variety of ways in which it may deal with the pending motion to dismiss, from denying the motion as moot to considering the merits of the motion in light of the amended complaint." *Guan,* 2023 WL 2242050, at *3 (internal quotation marks and citation omitted). Courts have "broad discretion in determining whether to grant leave to amend." *Gurary v. Winehouse*, 235 F.3d 792, 801 (2d Cir. 2000).

### C. *Rule 12(b)(1) Motion to Dismiss*

"A case is properly dismissed for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000); *see* Fed. R. Civ. P. 12(b)(1). While a district court resolving a motion to dismiss under Rule 12(b)(1) "must take all uncontroverted facts in the complaint . . . as true, and draw all reasonable inferences in favor of the party asserting jurisdiction[,] . . . . where jurisdictional facts are placed in dispute, the court has the power and obligation to decide issues of fact by reference to evidence outside the pleadings, such as affidavits," in which case "the party asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." *Tandon v. Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239, 243 (2d Cir. 2014) (internal quotation marks omitted).

### D. *Rule 12(b)(6) Motion to Dismiss*

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim will have "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*  This standard demands "more than a sheer possibility that a defendant has acted unlawfully." *Id*.

In considering a motion to dismiss, a court must accept as true all well-pleaded facts alleged in the complaint and must draw all reasonable inferences in the plaintiff's favor. *Kassner*, 496 F.3d at 237.  A complaint need not make "detailed factual allegations," but it must contain more than mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Iqbal*, 556 U.S. at 678 (internal quotation marks omitted).  Indeed, although all allegations contained in the complaint are assumed to be true, this tenet is "inapplicable to legal conclusions." *Id.* at 678.  A complaint is "deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002) (internal quotation marks omitted).

### IV.  <u>Discussion</u>

The First Amended Complaint asserts four claims:  (1) a whistleblower-discrimination claim against the Korean Parent Banks SHFG and SHB, and the Individual Defendants under the Anti-Money Laundering Act ("AMLA"); (2) a whistleblower-retaliation claim against SHBA and the Individual Defendants under the Financial Institutions Reform, Recovery, and Enforcement Act of 1989  ("FIRREA"); (3) gender-discrimination and retaliation claims by

Ramos against all Defendants under the NYCHRL; and (4) a retaliation claim by Park against all Defendants under the NYCHRL.  (FAC ¶¶ 338–75.)  The Proposed Second Amended Complaint asserts the same four claims and adds a fifth claim—a retaliation claim by all Plaintiffs against all Defendants under New Jersey common law.  (PSAC ¶¶ 363–408.)

I first address Defendants' motion to compel arbitration before addressing their motion to dismiss and Plaintiffs' motion for leave to amend.

## A.  *Motion to Compel Arbitration*

Defendants have waived arbitration because they previously moved to dismiss.  Before the Supreme Court's decision in *Morgan v. Sundance, Inc.*, 596 U.S. 411 (2022), the Second Circuit considered three factors in deciding whether a party has waived its right to arbitration under the FAA:  "(1) the time elapsed from when litigation was commenced until the request for arbitration; (2) the amount of litigation to date, including motion practice and discovery; and (3) proof of prejudice."  *La. Stadium & Expo. Dist. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 626 F.3d 156, 159 (2d Cir. 2010) (internal quotation marks omitted).  In *Morgan*, the Supreme Court held that "the usual federal rule of waiver does not include a prejudice requirement," and that courts must focus instead on whether a party has "knowingly relinquish[ed] the right to arbitrate by acting inconsistently with that right."  596 U.S. at 419.

Here, the parties have devoted many pages to Defendants' delay in seeking arbitration and whether discovery has commenced.  However, in *Doyle*, the Second Circuit clarified that, after *Morgan*, "the core inquiry is neither the *length* of the delay nor the *amount* of litigation that has occurred," but rather "the moving party's conduct."  *Doyle v. UBS Fin. Servs., Inc.*, 144 F.4th 122, 130 (2d Cir. 2025) (emphasis in original).  *Doyle* is dispositive on the issue of waiver.  In *Doyle*, the Second Circuit held that defendants waived arbitration because they "first fil[ed] a

motion to dismiss." *Id.* at 133.  The *Doyle* case had a different procedural history than this action since the defendants there had moved to compel arbitration only after the district court had denied their motion to dismiss, *id.* at 131, and in the instant action the motion to dismiss was pending when Defendants sought arbitration.  However, whether a defendant waited until after a decision on the motion to dismiss is not dispositive; the issue was whether the defendant had previously moved to dismiss.  The Second Circuit's held that defendants waived arbitration when they "acted inconsistently with their right to arbitration by first filing a motion to dismiss." *Id.* at 133.  The fact that the *Doyle* defendants waited until the motion to dismiss was decided merely confirmed to the Second Circuit that those defendants had acted inconsistently with their right to arbitration.  Although Defendants here have a stronger argument against waiver than the defendants in *Doyle* because a final decision on the motion to dismiss had not been rendered when they moved to compel arbitration, their motion to compel arbitration still fails.  Defendants here moved to dismiss on June 8, 2023, (Doc. 15), and waited for over a year before first indicating their intention to seek arbitration on October 28, 2024, (Doc. 33).  These inconsistent actions indicate a knowing waiver of their right to compel arbitration.

The other factors, the length of delay and the amount of litigation to date, are also not dispositive.  Although they rightly argue that no discovery has occurred, Defendants fail to explain their delay or otherwise acknowledge that a significant amount of motion practice had taken place by the time they moved to compel arbitration.  Defendants' assertion that they "retained new counsel in this Action who immediately raised that Plaintiffs' claims were subject to arbitration," (MTC Mem. 4), is insufficient justification.  Defendants surely knew about these arbitration agreements, which they describe as "a condition of [Plaintiffs'] employment at

SHBA." (*Id.* at 1.)[11]  That Defendants' previous counsel moved to dismiss without requesting arbitration does not excuse the delay because "each party is deemed bound by the acts of his lawyer-agent." *Gomez v. City of New York*, 805 F.3d 419, 424 (2d Cir. 2015) (per curiam) (quoting *Link v. Wabash R.R. Co.*, 370 U.S. 626, 634 (1962)).

"[A] party with a claim to arbitration faces a binary choice: litigation or arbitration." *Doyle*, 144 F.4th at 131.  By first moving to dismiss, Defendants chose litigation.  Defendants' motion to compel arbitration and stay this action is DENIED.  Therefore, I now consider the motion to dismiss and motion to amend the First Amended Complaint.[12]

### B.  *Motion to Dismiss and Motion for Leave to Amend.*

Defendants moved to dismiss the entirety of the First Amended Complaint.  (Doc. 15.) The Proposed Second Amended Complaint contains new factual allegations related to existing claims and a new state claim, and attaches as exhibits seven whistleblower complaints— referenced in both the original complaint and Plaintiffs' FAC—that were sent to the FDIC and the NY DFS, as well as several consent orders between SHBA and the FDIC and between SHBA and the Financial Crimes Enforcement Network ("FinCEN").  (*See* PSAC.)

In assessing futility of proposed amendments, courts begin by determining whether each amended claim would survive a motion to dismiss.  *See Lucente v. Int'l Bus. Machs. Corp.*, 310 F.3d 243, 258 (2d Cir. 2002) ("An amendment to a pleading is futile if the proposed claim could not withstand a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6)."); *see also Cuoco v.*

---

[11] Moreover, Defendants submitted copies of the arbitration agreements, (Doc. 44-3), which show essentially identical arbitration agreements, likely drafted by Shinhan Bank America, with the name of the employee written by hand.  These agreements further indicate that Defendants were aware of their existence long before the pending motions were filed.

[12] I do not opine on whether Plaintiffs' proposed fifth claim under New Jersey state law should proceed in arbitration because, for the reasons below, I deny Plaintiffs' motion for leave to amend to add that claim because I decline to exercise supplemental jurisdiction over Plaintiffs' state claims.

*Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) (where the "problem" with the claim is "substantive" and "better pleading will not cure it," then repleading is futile).  As is the case with regard to the four operative claims, if "the primary claims remain the same between the proposed amended complaint and the complaint which a defendant has moved to dismiss, the Court may consider the merits of the motion to dismiss in light of the proposed amended complaint." *Guan,* 2023 WL 2242050, at *3 (internal quotation marks omitted); *accord. IBEW Loc. Union No. 58 Pension Tr. Fund & Annuity Fund v. Royal Bank of Scot. Grp., PLC*, 783 F.3d 383, 389 (2d Cir. 2015) ("[T]he standard for denying leave to amend based on futility is the same as the standard for granting a motion to dismiss.").

As an initial matter, Defendants oppose Plaintiffs' proposed amendments as stated in the PSAC as futile for two independent reasons, neither of which is persuasive.  First, Defendants argue that most of Plaintiffs' claims should be litigated in arbitration.  (Am. Opp'n 1.)  As explained above, I have already denied Defendants' motion to compel arbitration as to the four claims in the FAC.  However, I note that Defendants have not sought to supplement their motion to dismiss to add the fifth claim alleged in the PSAC.  I need not address whether Plaintiffs' fifth claim under New Jersey state law is futile because, as discussed below, I decline to exercise supplemental jurisdiction. *See infra* Section IV.B.3.

Second, Defendants argue that Plaintiffs abandoned the only non-arbitrable claim—the AMLA claim.  (Am. Opp'n 1.)  In their motion to dismiss, Defendants argued, among other things, that the AMLA claim fails because (1) the AMLA does not provide for individual liability and (2) failure to meet the AMLA's exhaustion requirements.  (MTD Mem. 17–20.)  According to Defendants, Plaintiffs opposed only the exhaustion-requirements argument, and thus waived any argument regarding individual liability.  (Am. Opp'n 5–6.)  However, the cases

Defendants cite suggest that such abandonment can be inferred only when Plaintiffs fail to address any argument about a specific claim. *See, e.g.*, *Simon v. City of New York*, No. 14-CV-8391, 2015 WL 2069436, at *2 (S.D.N.Y. May 4, 2015) (finding that plaintiffs abandoned claims where they failed to respond to any of defendants' arguments regarding those claims); *Chamberlain v. City of White Plains*, 986 F. Supp. 2d 363, 392 (S.D.N.Y. 2013) (finding abandonment of *Monell* claim where the "Complaint contains no factual content" regarding the *Monell* theory and "Plaintiff's motion papers do not address it"); *Tulino v. City of New York*, No. 15-CV-7106, 2016 WL 2967847, at *2 (S.D.N.Y. May 19, 2016) (dismissing claims because "Plaintiff either consents to dismissal or does not oppose Defendants' motion with respect to" those claims; *Chauhan v. MM Hotel Mgmt. LLC*, No. 18-CV-5963, 2019 WL 6118006, at *5 (E.D.N.Y. Nov. 18, 2019) (finding abandonment where plaintiff did not address several causes of action at all). Here, Plaintiffs decided to address the exhaustion-requirement argument related to the AMLA claim. I will not find Plaintiffs to have abandoned a claim merely because they decided to address some, but not all, arguments related to that claim.

I now turn to Plaintiff's claims under the AMLA, FIRREA, and state law.

### 1. AMLA Claim

Plaintiffs claim that the Korean Parent Banks SHFG and SHB, and the Individual Defendants violated the whistleblower protections of the AMLA, which was passed in 2021 as an amendment to the Bank Secrecy Act. Plaintiffs' AMLA claim is dismissed because the AMLA (1) requires exhaustion of administrative remedies and (2) does not provide for individual liability.

a.  The AMLA's Administrative Exhaustion Requirements

Plaintiffs' AMLA claim is dismissed for lack of subject-matter jurisdiction pursuant to Rule 12(b)(1).  *Cf. Sackey v. United States*, No. 24-1223C, 2025 WL 1865774, at \*4 (Fed. Cl. July 7, 2025) (finding no "subject-matter jurisdiction over claims invoking § 5323" based on the AMLA's "specific and comprehensive administrative and judicial scheme of relief").  Plaintiffs do not allege, either in the FAC or the PSAC, that they met the AMLA's exhaustion requirement by filing any complaint with the Secretary of Labor.  Rather, the parties dispute whether an exhaustion requirement exists at all under the AMLA.  (*See* MTD Mem. 17; MTD Opp'n 29.)

Based on the plain text of the AMLA and case law regarding analogous whistleblower statutes, I hold that a claimant alleging whistleblower discrimination must exhaust administrative remedies prior to filing a district court complaint.  First, the statutory text provides:

> Enforcement -- Any individual who alleges discharge or other discrimination, or is otherwise aggrieved by an employer, in violation of paragraph (1), may seek relief by--
>
> (A) filing a complaint with the Secretary of Labor in accordance with the requirements of this subsection; or
>
> (B) if the Secretary of Labor has not issued a final decision within 180 days of the filing of a complaint under subparagraph (A), and there is no showing that such a delay is due to the bad faith of the claimant, bringing an action against the employer at law or in equity in the appropriate district court of the United States, which shall have jurisdiction over such an action without regard to the amount in controversy.

31 U.S.C § 5323(g)(2).  The statute also prohibits an action from being brought under paragraph (2)(B) if it is brought "(aa) more than 6 years after the date on which the violation of paragraph (1) occurs; or (bb) more than 3 years after the date on which when facts material to the right of action are known, or reasonably should have been known."  *Id.* § 5323(g)(3)(B)(ii)(I).

Plaintiffs argue that the AMLA does not require administrative exhaustion because, if it

did, the statute "would not have provided a separate statute of limitations for a district court complaint, as that would be redundant." (MTD Opp'n 30.) I disagree. The statute of limitations that governs a claimant's district-court complaint explicitly applies to actions brought in accordance with paragraph 2(B). These are actions brought subsequent to the Secretary of Labor's failure to issue a timely final decision. Unlike statutes like Dodd-Frank, 15 U.S.C. § 78u-6, for example, which explicitly permits a whistleblower alleging discrimination to immediately initiate an action in federal court, the plain text of the AMLA sets forth an enforcement mechanism that requires claimants to first exhaust claims with the Secretary of Labor. Other statutes with provisions nearly identical to the AMLA, most notably the Sarbanes-Oxley Act ("SOX"), have been interpreted to impose administrative exhaustion requirements, which must be met to confer subject-matter jurisdiction to the courts. *See, e.g.*, *Daly v. Citigroup Inc.*, 939 F.3d 415, 418 (2d Cir. 2019) (affirming dismissal of SOX claim "because the district court lacked subject matter jurisdiction inasmuch as the plaintiff failed to exhaust her administrative remedies under the statute, which constitutes a jurisdictional bar to suit in federal court"). Plaintiffs' only citations are to two decisions from the Labor Department's Administrative Review Board from 2005 and 2009, (MTD Opp'n 30); however, both predate enactment of the relevant provision in the AMLA and are therefore not persuasive.

Although the Second Circuit has yet to address this question, some district courts have interpreted the AMLA to require administrative exhaustion. *See, e.g.*, *Gooden v. Joseph P. Addabbo Fam. Health Ctr., Inc.*, No. 21-CV-6313, 2023 WL 2709735, at *7 (E.D.N.Y. Mar. 30, 2023) (interpreting 31 U.S.C. § 5323(g)(2)(A)–(B) to be analogous with SOX and therefore require exhaustion); *Wegman v. United States Specialty Sports Ass'n, Inc.*, No. 23-CV-1637, 2024 WL 5679233, at *5 (M.D. Fla. Nov. 22, 2024) ("AMLA provides a private right of action

to whistleblowers who have filed a complaint with the Secretary of Labor and not received a

final decision within 180 days."); *Chaleplis v. Karloutsos*, No. 21-CV-1492, 2023 WL 2976277,

at *3 (E.D. Pa. Apr. 18, 2023) (interpreting 31 U.S.C. § 5323(g)(B) to require exhaustion based

on its "plain statutory language" and interpretation of the "near-identical requirements" of SOX).

The logic of these decisions is persuasive.  I accordingly find that AMLA has an exhaustion

requirement, and that it is a jurisdictional prerequisite to confer subject-matter jurisdiction.

Because neither the FAC nor the PSAC alleges administrative exhaustion, I lack subject-matter

jurisdiction over the AMLA claim and it must be dismissed pursuant to Rule 12(b)(1), and

amendment would be futile.[13]

### b.  The AMLA Does Not Provide for Individual Liability

Plaintiffs' AMLA claim against the Individual Defendants is independently doomed

because the AMLA does not provide for individual liability.  The statutory text prohibits only an

"employer" from retaliating against whistleblowers.  *See* 31 U.S.C. § 5323(g)(1).  Although the

AMLA does not define "employer," an analogous statute, the False Claims Act, has been

interpreted to impose liability only on employers, and not to individuals.  *See United States ex*

*rel. Sarafoglou v. Weill Med. Coll. of Cornell Univ.*, 451 F. Supp. 2d 613, 624 (S.D.N.Y. 2006)

(citing *Yesudian ex rel. United States v. Howard Univ.*, 270 F.3d 969, 972 (D.C. Cir. 2001)).

The AMLA's statutory limitation to "employer" contrasts with other whistleblower statutes that

expressly also hold "employees" or other "agents" liable.  *See, e.g.*, 18 U.S.C. § 1514A(a)

(Sarbanes-Oxley Act); 26 U.S.C. § 7623(d) (Taxpayer First Act).  Therefore, I find that the

---

[13] Even if the exhaustion requirement were not jurisdictional, I would dismiss the AMLA claim for failure to state a claim.  *See Sleem v. United States Fed. Gov't*, No. 22-CV-355, 2023 WL 3143429, at *5 (E.D.N.C. Mar. 27, 2023) (recommending dismissal for failure to state a claim for failure to exhaust administrative remedies), *report and recommendation adopted*, 2023 WL 3136119 (E.D.N.C. Apr. 27, 2023), *aff'd*, No. 23-1565, 2023 WL 6972440 (4th Cir. Oct. 23, 2023).

AMLA does not impose individual liability, and accordingly would dismiss Plaintiffs' AMLA claim against the Individual Defendants for this independent reason. Because the PSAC's new factual allegations regarding the AMLA claim are irrelevant to the issue of whether the AMLA provides for individual liability, such amendment would be futile.

Therefore, Defendants' motion to dismiss the AMLA claim is GRANTED and Plaintiffs' motion for leave to amend the AMLA claim is DENIED as futile.

### 2. FIRREA Claim

Plaintiffs next claim that SHBA and the Individual Defendants violated the whistleblower-retaliation provision of FIRREA. The whistleblower provisions of FIRREA, codified as amended, prohibit an "insured depository institution" from "discharg[ing] or otherwise discriminat[ing] against any employee . . . because the employee . . . provided information to any Federal banking agency or to the Attorney General" regarding "a possible violation of any law or regulation." 12 U.S.C. §1831j(a)(1).

A burden-shifting framework applies for Section 1831j claims. *See* 12 U.S.C. § 1831j(f). To establish a *prima facie* case, a claimant must first establish that he engaged in protected activity under the statute, and that this whistleblowing action was "a contributing factor" in the adverse employment action. 5 U.S.C. § 1221(e)(1). A claimant can establish that the disclosure was a contributing factor through "circumstantial evidence," including evidence that "(A) the official taking the personnel action knew of the disclosure or protected activity; and (B) the personnel action occurred within a period of time such that a reasonable person could conclude that the disclosure or protected activity was a contributing factor in the personnel action." *Id.* The burden then shifts to the defendant to demonstrate by clear and convincing evidence that the employment action would have been taken regardless of the disclosure by the employee. *Id.*

22

§ 1221(e)(2).

Here, Plaintiffs' FIRREA claim is dismissed because (1) Plaintiffs fail to establish that any whistleblowing activity was a "contributing factor" in their termination, and (2) FIRREA does not provide for individual liability.

### a.  Plaintiffs Fail to Plead a Contributory Factor

Plaintiffs' FIRREA claim fails to establish that any purported whistleblowing to the FDIC was a "contributing factor" for any retaliation.[14]  It is axiomatic that one cannot retaliate against another for protected activity without knowledge of that protected activity.  Indeed, the statutory text contemplates this axiom and requires that the defendant "knew" of the claimant's alleged whistleblowing.  *See* 5 U.S.C. § 1221(e)(1)(A) ("The employee may demonstrate that the disclosure was a contributing factor in the personnel action through circumstantial evidence, such as evidence that (A) the official taking the personnel action knew of the disclosure . . ."); *see also Cosgrove v. Fed. Home Loan Bank of New York*, No. 90-CV-6455, 1999 WL 163218, at *11 (S.D.N.Y. Mar. 23, 1999) (finding no prima facie case of retaliation under whistleblower provision of FIRREA where plaintiff failed to establish that defendants "knew of the disclosure").

Plaintiffs fail to establish that SHBA knew about the FDIC complaints prior to the termination of Plaintiffs' employment or other alleged retaliation.  The FAC contains mostly conclusory statements that Defendants "were aware" of Plaintiffs' allegedly protected activity.

---

[14] Plaintiffs' complaints sent internally or to the NY DFS cannot be whistleblowing activity because they were not made to a "Federal banking agency."  *See* 12 U.S.C. § 1831j(a)(1); s*ee also Faiman* v. *Ridgewood Sav. Bank*, No. 12-CV-5003, 2013 WL 3305785, at *2 (S.D.N.Y. May 31, 2013) (dismissing FIRREA claim for failure to allege that plaintiff provided information to one of the enumerated agencies); *Schwyzer v. Fiduciary Tr. Co. Int'l*, No. 04-CV-7975, 2008 WL 3539971, at *4 (S.D.N.Y. Aug. 4, 2008) (dismissing FIRREA complaint when plaintiffs only complained to internal legal department).  I accordingly only analyze Plaintiffs' purported complaints to the FDIC, which I assume is protected activity for the purposes of this Opinion & Order.

(*See, e.g.*, FAC ¶¶ 205 ("Defendants became aware of KUZMIAK's complaint to the FDIC"), 340 (alleging that "Defendants were well aware" of alleged protected activity), 351 (alleging that "Defendants were aware" of alleged protected activity).)  The only factual support to explain Defendants' supposed knowledge of each of Plaintiffs' FDIC complaints relate exclusively to Adamson.  There, Plaintiffs claim that Adamson's registration with FDIC Connect resulted in an email sent to his SHBA email account, and that it "would have been detected by Defendants' IT monitoring department."  (*Id.* ¶ 175.)

These conclusory allegations are insufficient to establish that anyone at the Bank knew about the FDIC complaints, let alone that "the official taking the personnel action," had any knowledge.  *See* 5 U.S.C. § 1221(e)(1)(A).  Plaintiffs' have not specifically alleged which bank official took the allegedly adverse personnel action against each individual Plaintiff, and instead have alleged that "SHBA, through its agents and officers, terminated their employment."  (FAC ¶ 350.)  As Defendants note, Plaintiffs do not allege any facts as to "how or when each of Defendants allegedly learned" of any of the FDIC complaints.  (MTD Mem. 15.)  In making their request—that I impute corporate knowledge of all protected activity simply because the whistleblower complaints were sent "using SHBA's network and/or sent via FDIC Connection," which were "strictly monitored by the Bank and its IT Department"—Plaintiffs fail to cite any supporting case law, and their argument is unpersuasive.  Although courts have recognized general corporate knowledge in the Title VII context, this general corporate knowledge "arise[s] when a supervisor, corporate officer, or employee whose job is to investigate and resolve discrimination complaints becomes aware of the protected activity."  *Armstrong v. Metro. Transp. Auth.*, No. 07-CV-3561, 2014 WL 4276336, at *20 (S.D.N.Y. Aug. 28, 2014) (citing *Patane v. Clark*, 508 F.3d 106, 115 (2d Cir. 2007)).  Plaintiffs' conclusory allegations are

non-specific and do not allege any such employee's knowledge sufficient to impute general

corporate knowledge.  To the extent that Plaintiffs argue that Adamson's use of his work email

imputes corporate knowledge, such an allegation does nothing to indicate corporate knowledge

related to the alleged protected activities of Kuzmiak, Park, and Ramos.  Plaintiffs cite no

authority to support a finding that one defendant's knowledge of one plaintiff's protected activity

can support an inference of knowledge of the protected activity of other plaintiffs.  A contrary

finding could eviscerate the contributory-factor requirement and allow a plaintiff to make a

FIRREA whistleblower claim against a defendant who had no knowledge of that plaintiff's

protected activity.

Plaintiffs' related arguments center on the "circumstantial evidence" of the temporal

proximity between the alleged protected activity and retaliation, including alleged "intensified

surveillance" by "Korean expat employees."  (MTD Opp'n 23–24.)  As support, Plaintiffs cite an

out-of-circuit opinion seemingly for the uncontroversial proposition that knowledge can be

derived from circumstantial evidence, including temporal proximity.  (*See id.* (citing *Kell v.*

*Iberville Bank*, 352 F. Supp. 3d 650, 657 (E.D. La. 2018)).  It is not disputed that circumstantial

evidence can be considered, including temporal proximity.  Even so, temporal proximity alone is

generally insufficient to support a claim of retaliation.  *Cf. Forrester v. Corizon Health, Inc.*, 752

F. App'x. 64, 66 (2d Cir. 2018) (summary order).  To the extent Plaintiffs seek to compare the

weight of the circumstantial evidence here to the evidence found to be sufficient in *Kell*, the

circumstantial evidence in *Kell* was more substantial.  Specifically, in *Kell* it was (1) "undisputed

that [d]efendant regarded [p]laintiff as an excellent employee before" the termination of her

employment (2) plaintiff's whistleblower disclosure of documents occurred 15 days before the

termination of her employment, and (3) the official who terminated the plaintiff's employment

had access to the whistleblowing documents that the plaintiff sent to the FDIC because plaintiff stored those documents on an outside server which were captured in screenshots taken by the defendant bank's IT staff and those screen shots clearly showed that the documents were related to plaintiff's whistleblowing activity. *See Kell*, 352 F. Supp. 3d at 658–59. The court found that, although the official's knowledge that plaintiff had stored these documents outside of Defendant's servers is not "conclusive proof" that plaintiff in fact filed a complaint with the FDIC, it was sufficient to establish circumstantial evidence of the official's knowledge. *Id.* at 659.

Here, Plaintiffs fail to allege comparable facts. There is no allegation that any SHBA employee saw the FDIC complaints or shared knowledge of those complaints with any Defendant. Unlike in *Kell* where the storing of the documents on an outside server was directly related to the termination of plaintiff's employment, Plaintiffs concede that the reasons given to each Plaintiff for their respective termination had nothing to do with any alleged whistleblowing activity. (*See* FAC ¶ 187 (Adamson's employment terminated due to department restructuring); ¶¶ 284–85 (Kuzmiak's employment terminated due to performance-related issue); ¶ 258 (Park's and Ramos' employment terminated for performance-related issues).) Therefore, Plaintiffs cannot rely on the proffered reason for termination as evidence of knowledge. Plaintiffs have entirely failed to plausibly allege facts sufficient for a reasonable factfinder to conclude that anyone at SHBA, let alone the "official taking the personnel action," had knowledge of any of Plaintiffs' protected disclosures. Plaintiffs have thus failed to sufficiently allege that any of their protected activity was a "contributing factor" in the subsequent termination of their respective employment. Plaintiffs' FIRREA claim must therefore be dismissed.

The PSAC does not resuscitate Plaintiffs' FIRREA claim. The PSAC alleges that "[u]pon

information and belief," any activity on the FDIC Connect portal was "strictly monitored and surveilled by SHBA and its IT Department." (PSAC ¶ 177.) Because SHBA's firewall allowed "only a handful of websites to be accessible, and all others were blocked," SHBA could engage in "enhanced monitoring." (*Id.*) As to Adamson only, SHBA "would have [] detected" his registration with FDIC Connect because a registration email was sent to his SHBA email account. (*Id.* ¶¶ 176–77.) These amendments do not materially change the strength of Plaintiffs' argument regarding "contributory factor," and I would still dismiss Plaintiffs' FIRREA claim. I decline to impute corporate knowledge of every single website accessed by every single employee simply because of the existence of a firewall system, and Plaintiffs fail to allege facts that would support an inference that Defendants were monitoring Plaintiffs' email communications.

The other amendments likewise do not meet the contributory-factor requirement to state a FIRREA claim. The PSAC primarily adds more information, including quotations from emails, regarding Plaintiffs' alleged protected activity. (*See, e.g.*, PSAC ¶¶ 206, 208, 216, 283.) More details about the FDIC complaints themselves do nothing to demonstrate Defendants' knowledge of any specific complaint. The PSAC also adds information regarding a meeting between the NY DFS and certain Individual Defendants, a meeting that Plaintiffs claim "was held, upon information and belief, in response to Plaintiffs' whistleblower complaints" to the NY DFS. (*Id.* ¶ 253.) However, not only would complaints to the NY DFS fall outside the scope of a FIRREA claim, *see supra* n.14, "[c]onclusory pleadings on information and belief are inadequate as a matter of law to survive a motion to dismiss," *Knapp v. Maron*, No. 14-CV-10121, 2016 WL 2851563, at *2 (S.D.N.Y. May 12, 2016) (citation modified). Finally, the PSAC asserts new factual allegations regarding SHBA's September 2023 Consent Order from FinCEN. (*Id.*

¶¶ 344–62.)  Although this Consent Order may be relevant to Plaintiffs' theory of the case in general, it has little bearing on whether Defendants had knowledge of Plaintiffs' protected activity and indeed makes no reference to any whistleblowing activity. (*See generally* Doc. 56-5 (September 2023 FinCEN Consent Order).)  Any amendment is therefore futile, so Plaintiffs' motion for leave to amend the FIRREA claim is DENIED.[15]

### b.  12 U.S.C. § 1831j(a)(1) Does Not Provide for Individual Liability.

As with the AMLA claim, the FIRREA claim against the Individual Defendants also cannot survive because FIRREA does not impose individual liability under § 1831j(a)(1).  The relevant statutory text, which Plaintiffs do not dispute is applicable here, (FAC ¶ 350; PSAC ¶ 375), prohibits an "insured depository institution" from engaging in whistleblower discrimination.  12 U.S.C. § 1831j(a)(1).  Plaintiffs failed to respond to Defendants' argument that FIRREA does not impose individual liability, let alone cite any supporting authority.  Nor can they.

Section 1831j(a)(1) differs from Section 1831j(a)(2), which prohibits a "Federal banking agency, Federal home loan bank, Federal reserve bank, or any person who is performing, directly or indirectly, any function or service on behalf of the [FDIC]" from engaging in whistleblower discrimination.  12 U.S.C. § 1831j(a)(2).  In *Segarra*, the district court held that § 1831j(a)(2) does not provide for individual liability based on the statutory text and relevant case law. *Segarra v. Fed. Rsrv. of N.Y.*, 17 F. Supp. 3d 304, 308–09 (S.D.N.Y. 2014), *aff'd*, 802 F.3d 409 (2d Cir. 2015), and *aff'd*, 617 F. App'x 106 (2d Cir. 2015).  On appeal, the Second Circuit affirmed and clarified that Section 1831j(a)(2)'s statutory text limits individual liability to those

---

[15] Because I dismiss the FIRREA claim for failure to establish a "contributory factor," I need not analyze whether Plaintiffs have adequately alleged there was whistleblowing activity regarding a "possible violation of any law or regulation."

who acted "on behalf of" the FDIC, and that the plaintiff's allegations failed to "create a plausible and sufficient link between the Individual Defendants and the FDIC." *Segarra v. Fed. Rsrv. Bank of N.Y.*, 802 F.3d 409, 412 (2d Cir. 2015).  Section 1831j(a)(1) contains no similar language providing for individual liability; it does not cover "any person who" was acting "on behalf of" an insured depository institution.  "[I]t is generally presumed that Congress acts intentionally and purposely when it includes particular language in one section of a statute but omits it in another." *In re New Haven Projects Ltd. Liab. Co.*, 225 F.3d 283, 288 (2d Cir. 2000) (quoting *BFP v. Resolution Tr. Corp.*, 511 U.S. 531, 537 (1994)).  Here, Congress clearly could have included (but did not) such language providing for individual liability to Section 1831j(a)(1).  I therefore find that Section 1831j(a)(1) does not provide for individual liability, and only permits claims against the "insured depository institution."  12 U.S.C. § 1831j(a)(1).

Accordingly, Plaintiffs' FIRREA claim against the Individual Defendants is DISMISSED.  For the same reasons, because any FIRREA claim against the Individual Defendants cannot be cured by any amendment, and any such amendment would be futile, the Proposed Second Amended Complaint fails to allege a FIRREA claim against the Individual Defendants.

Therefore, Defendants' motion to dismiss the FIRREA claim is GRANTED and Plaintiffs' motion for leave to amend the FIRREA claim is DENIED as futile.

### 3.  State Law Claims

The FAC also asserts discrimination claims under the NYCHRL.  Where a plaintiff asserts sufficient federal discrimination claims, related state law discrimination claims fall within a district court's supplemental jurisdiction.  *See Treglia v. Town of Manlius*, 313 F.3d 713, 723 (2d Cir. 2002) (finding supplemental jurisdiction proper because Plaintiff's state discrimination

claim arises out of the same events as his federal retaliation claim).  Courts in this District, however, "routinely decline to exercise supplemental jurisdiction over a plaintiff's state law claims, including NYCHRL claims and common law torts, after dismissing all federal claims." *See Braunstein v. Sahara Plaza, LLC*, 16-CV-8879, 2021 WL 2650369, at *19 (S.D.N.Y. June 28, 2021) (collecting cases); *see also Morales v. N.Y.C. Dep't of Educ.*, 808 F. App'x 35, 38 (2d Cir. 2020) (summary order) ("[A]fter dismissing [plaintiff's] federal claims, the district court properly declined to exercise supplemental jurisdiction over her state law claims."); 28 U.S.C. § 1367(c) (district courts may decline to exercise supplemental jurisdiction over a claim if "the district court has dismissed all claims over which it has original jurisdiction").  Having dismissed all of Plaintiffs' federal claims, I decline to exercise supplemental jurisdiction over Plaintiffs' state claims.

Amendment would also be futile because I would decline to exercise supplemental jurisdiction over Plaintiffs' state claims.  In other words, even if I were to grant Plaintiffs leave to file the Proposed Second Amended Complaint, I would likewise decline to exercise supplemental jurisdiction over Plaintiffs' claims under the NYCHRL as well as the new claim under New Jersey law.  *See Block v. City Univ. of N.Y.*, No. 23-CV-7715, 2025 WL 1114738, at *8 (E.D.N.Y. Apr. 15, 2025) (finding amendment futile because proposed amendment complaint "fails to state a claim under federal law, and, as such, the court would once again decline to exercise supplemental jurisdiction over her remaining state law claim"); *Plante v. Dake*, No. 14-CV-106, 2014 WL 11460541, at *5 (N.D.N.Y. Aug. 1, 2014) (denying amendment as futile for lack of subject-matter jurisdiction over federal claims and declining to exercise supplemental jurisdiction over remaining state claims), *aff'd*, 621 F. App'x 67 (2d Cir. 2015).[16]

---

[16] Plaintiffs claim jurisdiction based on federal question jurisdiction, and assert that I have supplemental jurisdiction

Accordingly, Defendant's motion to dismiss Plaintiff's remaining NYCHRL claims is GRANTED.  Plaintiffs' motion for leave to amend Plaintiffs' NYCHRL claims and claim under New Jersey law is DENIED as futile.

## V.     Conclusion

For the foregoing reasons, Defendants' motion to compel arbitration is DENIED, and their motion to dismiss Plaintiffs' First Amended Complaint in its entirety is GRANTED. Plaintiffs' motion for leave to file the Proposed Second Amended Complaint is DENIED for futility.

The Clerk of Court is respectfully directed to close the open motions at Document 15 (motion to dismiss), Document 43 (motion to compel arbitration), and Document 55 (motion to amend), and to close this action.

SO ORDERED.

Dated: September 23, 2025
        New York, New York

Vernon S. Broderick
United States District Judge

---

over the state law claims.  (FAC ¶¶ 6–7.)  It is not clear that without federal question jurisdiction that there would be federal jurisdiction such that Plaintiffs could file this action in federal court.  Although Plaintiffs do not claim diversity jurisdiction, I note that it is unlikely to exist here.  The First Amended Complaint does not describe Plaintiffs' state of residency or citizenship.  However, it is likely that they are residents of New York because "the events or omissions giving rise to the claims occurred in the Southern District of New York," (*id.* ¶ 8), and the Plaintiffs likely worked in New York, (*see id.* ¶ 33 (describing Plaintiffs' work during the New York State bank examinations); ¶ 182 (describing Adamson's identification of supposed New York City COVID-19 directives); ¶ 244 (describing Park's sexual harassment complaint filed with the New York City website))).  SHBA is based in New York, (*id.* ¶ 15), so it is unclear whether there would be complete diversity in this action.